Wilfred **KEYES** et al., Plaintiffs-Appellees,

v.

**SCHOOL DISTRICT NO. 1, DENVER, COLORADO**, et al., Defendants-Appellants.

Wilfred **KEYES** et al., Plaintiffs-Appellants,

v.

**SCHOOL DISTRICT NO. 1, DENVER, COLORADO**, et al., Defendants-Appellees.

Nos. 336–70, 337–70.

United States Court of Appeals, Tenth Circuit.

June 11, 1971.

Gordon G. Greiner, Denver, Colo. (Conrad K. Harper, New York City, on the brief), for Keyes, and others.

William K. Ris, Denver, Colo. (Benjamin L. Craig and Michael H. Jackson, Denver, Colo., on the brief), for School District No. 1, and others.

Before PICKETT, HILL and SETH, United States Circuit Judges.

HILL, Circuit Judge.

This is a suit in which the parents of children attending Denver Public Schools sued individually, on behalf of their minor children, and on behalf of classes of persons similarly situated, to remedy the alleged segregated condition of certain Denver schools and the effects of that condition. The School District, the present Board of Education and its Superintendent were all named as defendants. The action was brought under 42 U.S.C. §§ 1983, 1985, 28 U.S.C. § 1343 (3), (4), and the Fourteenth Amendment of the United States Constitution seeking to enjoin defendants from maintaining, requiring, continuing, encouraging and facilitating separation of children and faculty on the basis of race, and further from unequally allocating resources, services, facilities and plant on the basis of race. Declaratory relief was also sought under 28 U.S.C. § 2201. On appeal, defendants appear as appellants and cross-appellees, and plaintiffs appear as appellees and cross-appellants.

The reported background is extensive. In July, 1969, appellees' motion for preliminary injunction was granted in an opinion found at 303 F.Supp. 279. The motion sought to enjoin the rescission of Resolutions 1520, 1524 and 1531. The preliminary injunction was appealed and was remanded by this court for further findings and consideration of additional questions. Thereafter, the preliminary injunction was supplemented and modified at 303 F.Supp. 289. The decision on the merits is recorded at 313 F.Supp. 61, and the remedies are set forth in an opinion at 313 F.Supp. 90.

The complaint set out two separate causes of action. The first cause contained six counts, all of which pertained to rescission of School Board Resolutions 1520, 1524 and 1531. Therein the plaintiffs alleged that these Resolutions were an attempt by the School Board to desegregate and integrate the public schools of Northeast Denver, and that the re-

scission of these resolutions was unconstitutional because the purpose and effect was to perpetuate racial segregation in the affected schools. In connection with this cause of action, plaintiffs urge that the rescission of the Board Resolutions constituted affirmative state action resulting in de jure segregation in the schools affected thereby. The second cause of action contained three counts that are pertinent here. The first count, in effect, alleged that through affirmative acts the defendants and their predecessors deliberately and purposely created and maintained racial and ethnic segregation in the so-called "core" area schools within the district. The second count, in effect, alleged that the defendants had purposely maintained inferior schools by their method of allocation to the schools, and such practice has caused those schools to be substantially inferior to other schools within the district with predominantly Anglo students. The effect of such practice, plaintiffs urged, denied the minority students an equal educational opportunity in violation of the equal protection clause of the Fourteenth Amendment. The third count was an attack upon the school district's neighborhood school policy. They urge such policy to be unconstitutional because it results in segregated education.

In substance, the trial court found and concluded as to the first claim that the named schools in Northeast Denver were segregated by affirmative state action. In its findings, the trial court noted specific instances of boundary gerrymandering, construction of a new school and classrooms, minority-to-majority transfers, and excessive use of mobile classroom units in this section of the district, all of which amount to unconstitutional state segregation. In addition, it was held that the adoption of Resolutions 1520, 1524 and 1531 was a bona fide attempt by the Board to recognize the constitutional rights of the students affected by prior segregation, and that the act of repudiating these Resolutions was unconstitutional state action resulting in de jure segregation. As to the second claim, on the first count, the court found that the acts complained of in the core area were not racially inspired, and accordingly the allegations of de jure segregation were not accepted. On the second count, the court found that although the core area schools were not segregated by state action, fifteen designated schools should be granted relief because it was demonstrated that they were offering their pupils an unequal educational opportunity in violation of the Fourteenth Amendment equal protection clause. Upon findings that the Denver neighborhood school policy had been constitutionally maintained under the standards set forth in Board of Education of Oklahoma City Public Schools, Independent Dist. No. 89 v. Dowell, 375 F. 2d 158 (10th Cir. 1967), and Downs v. Board of Education of Kansas City, 336 F.2d 988 (10th Cir. 1964), relief on the third count was denied.

On appeal in No. 336–70, appellants attack the findings and conclusions as to the first claim and the second count of the second claim. In the cross-appeal, No. 337–70, the Keyes class urge error in the findings and conclusions regarding the first and third counts of the second claim.

Appellants' initial argument in No. 336–70 makes a two-fold attack on the findings and conclusions regarding the existence of de jure segregation in the schools located in Denver's Northeast sector. First, it is contended that under a proper application of the law, the evidence will not support a finding of de jure segregation. Second, appellants argue that the act of rescinding Resolutions 1520, 1524 and 1531 was not an act of de jure segregation.

A complete understanding and resolution of the issues presented by appellants requires a survey of the events which preceded the Board's action in rescinding the three Resolutions. In the Denver Public School System, there are

92 elementary schools, 16 junior high schools, and 9 senior high schools.[1] There has never been a law in Colorado requiring separate educational facilities for different races. The policy to which the School Board has consistently adhered is the neighborhood school plan. The goal is a centrally located school which children living within the boundary lines must attend. Although the Board has no written policy governing the setting of attendance boundaries, several factors have apparently been employed. Among these are current school population in an attendance area, estimated growth of pupil population, the size of the school, distance to be traveled, and the existence of natural boundaries.[2] The Board also attempts to draw junior high school and senior high school boundary lines so that all students transferring from a given school will continue their education together.

On several occasions during the 1960's, the Board formed committees to study the equality of educational opportunities being provided within the system. In 1962, the Voorhees Committee was assigned the onerous task. That group recognized that in a school district where there are concentrations of minority racial and ethnic groups, the result of a neighborhood school system may be unequal educational opportunities. Therefore, they recommended that the School Board consider racial, ethnic and socioeconomic factors in establishing boundaries and locating new schools in order to create heterogeneous school communities. The recommendations were apparently ignored.

Thereafter, in May, 1964, the Board passed Policy 5100 which also recognized that the neighborhood school plan resulted in the concentration of some minority racial and ethnic groups in certain schools. Rather than abandon the neighborhood school concept, however, the Board decided to incorporate "changes or adaptations which result in a more diverse or heterogeneous racial and ethnic school population, both for pupils and for school employees." But nothing of substance was accomplished.

In 1966, the Berge Committee was formed to examine Board policies with regard to the location of schools in Northeast Denver and to suggest changes which would lead to integration of Denver students. This committee recommended that no new schools be built in Northeast Denver; that a cultural arts center be established for student use; that educational centers be created; and that superior educational programs be initiated for Smiley and Baker Junior High Schools. Again, the recommendations were not effected.

In 1968, the Board passed the Noel resolution which again formally recognized the problem of concentrated racial and ethnic minority school populations in Northeast Denver and the possibility of resulting unequal educational opportunities. The resolution directed the

---

I.

The overall racial and ethnic composition of Denver Public Schools as of 1968–69 was as follows:

| Educational Level | Total Students | % Anglo | % Negro | % Hispano |
|---|---|---|---|---|
| Elementary | 54,576 | 61.7 | 15.2 | 22.0 |
| Junior High | 18,576 | 64.0 | 15.5 | 17.0 |
| Senior High | 23,425 | 76.1 | 10.4 | 9.0 |
| Totals | 96,577 | 70.7 | 12.7 | 15.8 |

---

2. Report and Recommendations to the Board of Education School District Number One Denver, Colorado, by a Special Study on Equality of Educational Opportunity in the Denver Public Schools (March 1, 1964), pp. A–1 to A–6.

Superintendent of Schools to submit to the Board a comprehensive plan for integrating the Denver schools. A plan was submitted, and after a four-month study, Resolutions 1520, 1524 and 1531 were passed. In essence, each of these resolutions sought to spread the Negro populations of these schools to numerous schools by boundary changes, thereby achieving what has been described as racial balance in all of them so that their predominantly Negro populations would become roughly 20% and white students from other areas would produce an Anglo population in each school of about 80%. Resolution 1520 made changes in attendance areas of secondary schools; Resolution 1524 dealt with both secondary schools and junior high schools; and Resolution 1531 changed attendance areas of the elementary schools.

However, before full implementation of the Resolutions could be accomplished, a Board election was held. Two candidates who promised to rescind the Resolutions were elected, and thereafter the Board did rescind Resolutions 1520, 1524 and 1531. In their place, Resolution 1533 was passed which basically provided for a voluntary exchange program between the Northeast elementary schools and other elementary schools of the district. Shortly thereafter, this suit was initiated.

The schools of concern to this argument are located in Northeast Denver in what is generally referred to as the Park Hill area. The schools are: East High School, Smiley and Cole Junior High Schools, Barrett, Stedman, Hallett, Park Hill and Philips Elementary Schools. Prior to 1950, the Negro population was centered in the Five Points area, near the northwest corner of City Park. Since 1940, the Negro population has steadily increased from 8,000 to 15,000 in 1950, to 30,000 in 1960, and to approximately 45,000 by 1966. The residential movement reflecting this growth has been eastward, down a "corridor" which has fairly well defined north-south boundaries. In the early 1950's, York Street (some 16 blocks west of Colorado Boulevard) was the east boundary of the residential expansion. Ten years later, the movement had reached and crossed Colorado Boulevard to a limited degree, and now the corridor of Negro residences extends from the Five Points area to the eastern city limits. The schools of concern are in and adjacent to this narrow strip of Negro residences.

Barrett Elementary is located one block west of Colorado Boulevard in the heart of the Negro community. When it opened in 1960, the attendance lines were drawn to coincide almost precisely with the then eastern boundary of the Negro residential movement—Colorado Boulevard. When the school was being planned in 1958 and the sites for construction were being considered, the area west of Colorado Boulevard was already predominantly Negro; by 1960, when the school opened, the racial composition of the neighborhood which it was to serve was reflected in the 89.6% Negro student enrollment. In 1970, the racial and ethnic composition of the school was approximately 93% Negro, 7% Hispano.

In addition, Barrett was built to accommodate only 450 students, a factor which manifestly precluded its use to substantially relieve the overcrowded conditions at adjacent schools. In 1960, Stedman (then predominantly Anglo), which was eight blocks due east of Barrett, was well over its intended capacity. Rather than constructing a larger physical plant at Barrett to accommodate part of Stedman's overflow, Barrett's size was restricted to serve only those pupils west of Colorado Boulevard.

The trial court held that "the positive acts of the Board in establishing Barrett and defining its boundaries were the proximate cause of the segregated condition which has existed in that school since its creation, which condition exists at present. * * * The action of the Board * * * was taken with knowl-

edge of the consequences, and these consequences were not merely possible, they were substantially certain. Under such conditions we find that the Board acted purposefully to create and maintain segregation at Barrett." 303 F.Supp. at 290–291.

In 1960, Stedman was 96% Anglo, 4% Negro and was 20% above capacity. By 1962, it was 35 to 50% Anglo and 50 to 65% Negro. In 1963, it was 87.4% Negro and 18.6% Anglo, and still overcrowded. By 1968, this school was 94.6% Negro and 3.9% Anglo. Stedman is eight blocks due east of Barrett, and in 1960 the residential trend all but insured that in a few years it would be predominantly Negro. In 1962, three boundary changes were proposed to the Board which would have transferred students from Stedman to Smith, Hallett and Park Hill, each of which was predominantly Anglo. These three proposals were refused by the Board. In 1964, the Board made two boundary changes which affected Stedman: (1) a predominantly Anglo section of Stedman's school zone was detached to Hallett, and (2) the Park Hill—Stedman optional zone (96% Anglo) was transferred to Park Hill. To facilitate an expanding population at Stedman, which was overwhelmingly Negro, mobile units were erected.

The trial court held: "The actions of the Board with respect to boundary changes, installation of mobile units and repeal of Resolution 1531 shows a continuous affirmative policy designed to isolate Negro children at Stedman and to thereby preserve the 'white' character of other Park Hill schools." 303 F.Supp. at 292.

In 1960, Park Hill and Philips Elementary Schools were predominantly Anglo. In 1968, Park Hill was 71% Anglo, 23.2% Negro and 3.8% Hispano; Philips was 55.3% Anglo, 36.6% Negro and 5.2% Hispano. Notwithstanding the Negro movement into this area, these two schools have continued to maintain a majority of Anglos in the student body.

The court stated: "In light of the natural and probable segregative consequences of removing the stabilizing effect of Resolution 1531 on Park Hill and Philips and re-establishing the original district boundaries, the Board must be regarded as having acted with a purpose of approving those consequences." 303 F.Supp. at 292–293.

In 1960, Hallett Elementary was 99% Anglo; in 1968 it was 90% Negro, 10% Anglo. The school is about 12 blocks due east of Stedman. When the Stedman boundary changes were considered in 1962, Hallett was under capacity and was 80 to 95% Anglo. The results of the boundary changes, had they occurred, would have brought Hallett up to capacity and would have had an integrative effect on the latter school. The 1964 Stedman boundary change that sent the predominantly Anglo section of Stedman to Hallett resulted in a 80% Anglo section of Hallett's attendance area being transferred to Philips. The effect of the Hallett to Philips transfer was a reduction in Anglo pupils at Hallett from 68.5 to 41.5%. By 1965, when four mobile units were built and additional classrooms constructed, Hallett was 75% Negro.

The court said: "The effect of the mobile units and additional classrooms was to solidify segregation at Hallett increasing its capacity to absorb the additional influx of Negro population into the area." 303 F.Supp. at 293.

The feeder schools for Smiley Junior High School are Hallett, Park Hill, Smith, Philips, Stedman, Ashley and Harrington. By the established residential trend, Smiley will soon be all Negro. In 1968 there were 23.6% Anglo, 71.6% Negro and 3.7% Hispano, and there were 23 minority teachers. Only one other school in the entire Denver system, Cole Junior High, had more than six minority teachers. The court held: "The effect of this repeal [of Resolutions 1520 and 1524] was to re-establish Smiley as a segregated school by affirmative Board action. At the time of the repeal,

it was certain that such action would perpetuate the racial composition of Smiley at over 75 percent minority and that future Negro population movement would ultimately increase this percentage. * * * We, therefore, find that the action of the Board in rescinding Resolutions 1520 and 1524 was wilful as to its effect on Smiley." 303 F.Supp. at 294.

In 1969, East High School was 54% Anglo, 40% Negro and 7% Hispano. The court held that neither before nor after the passage of Resolution 1520 could East be considered segregated. But "[r]escission of these Resolutions might, through the feeder system, result in a segregated situation at East in the future." 303 F.Supp. at 294. In the opinion at 313 F.Supp. 61, 67, the trial court extended its findings of de jure segregation to East High and Cole Junior High: "The effect of the rescission of Resolution 1520 at East High was to allow the trend toward segregation * * * to continue unabated. The rescission of Resolution 1524 as applied to Cole Junior High was an action taken which had the effect of frustrating an effort at Cole which at least constituted a start toward ultimate improvement in the quality of the educational effort there. * * * We must hold then that this frustration of the Board plan which had for its purpose relief of the effects of segregation at Cole was unlawful."

■ Thus the issue is whether, under applicable constitutional principles, the Board has acted with regard to the Park Hill area schools in a manner which violates appellees' Fourteenth Amendment rights. This controversy was tried to the district court without a jury. On the basis of the testimony and exhibits produced at that trial, the court made findings of fact and conclusions of law. To the extent that appellants' or cross-appellants' arguments rest upon a relitigation or reassessment of factual matters, Rule 52 F.R.Civ.P. 28 U.S.C. requires us to defer to the findings of the trial court unless we are satisfied that they are clearly erroneous. Mitchell v. Texas Gulf Sulphur, 446 F.2d 90 (10th Cir. 1971); Firemen's Fund Insurance Company v. S. E. K. Construction Company, Inc., 436 F.2d 1345 (10th Cir. 1971).

■ We begin with the fundamental principle that state imposed racial segregation in public schools is inherently unequal and violative of the equal protection clause. Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971); Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954); Downs v. Board of Education of Kansas City, 336 F.2d 988 (10th Cir. 1964). This Fourteenth Amendment prohibition against racial discrimination in public schools is not limited to the action of state legislatures, but applies with equal force to any agency of the state taking such action. Cooper v. Aaron, 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed. 2d 5 (1958). And we can perceive no rational explanation why state imposed segregation of the sort condemned in Brown should be distinguished from racial segregation intentionally created and maintained through gerrymandering, building selection and student transfers. Taylor v. Board of Education of City School District of City of New Rochelle, 294 F.2d 36 (2nd Cir. 1961).

■ Appellants maintain that although a racial imbalance does exist in the Park Hill area schools, it is justifiable under their neighborhood school policy which has been and is now operated with total neutrality regarding race. It is true that the rule of the Circuit is that neighborhood school plans, when impartially maintained and administered, do not violate constitutional rights even though the result of such plans is racial imbalance. United States v. Board of Education of Tulsa County, 429 F.2d 1253 (10th Cir. 1970); Board of Education of Oklahoma City Public Schools, Independent Dist. No. 89 v. Dowell, 375 F.2d 158 (10th Cir. 1967); Downs v. Board of Education of Kansas City, su-

pra. However, when a board of education embarks on a course of conduct which is motivated by purposeful desire to perpetuate and maintain a racially segregated school, the constitutional rights of those students confined within that segregated establishment have been violated.

█ The evidence supports the trial court's findings regarding Barrett Elementary School. When construction of new schools in predominantly Negro neighborhoods is based on rational, neutral criteria, segregative intent will not be inferred. Deal v. Cincinnati Board of Education, 369 F.2d 55 (6th Cir. 1966); Sealy v. Department of Public Instruction of Pennsylvania, 252 F.2d 898 (3rd Cir. 1958); Craggett v. Board of Education of Cleveland, 234 F.Supp. 381 (N.D. Ohio 1964); Henry v. Godsell, 165 F. Supp. 87 (E.D.Mich.1958). Conversely, if the criteria asserted as justification for the construction and designation of attendance lines are a sham or subterfuge to foster segregation, odious intent may be inferred. Here there is sufficient evidence to support segregative intent.

█ The school was admittedly built in an area of increasing school population with the stated purpose of relieving overcrowded conditions at nearby schools. But the size of the school belies its intended purpose. Although Negro students transferred from nearby schools, with a large segment of Negro children formerly bussed to Park Hill being transferred to Barrett, none of the Anglos from overcrowded Stedman, eight blocks away, were transferred to Barrett, And in point of fact, the small physical plant at Barrett did little to relieve the overcrowded conditions in nearby elementary schools since even after 1960 every adjacent elementary school continued to operate over its intended capacity.[3] The only school which now approached its actual intended capacity was Park Hill, which was predominantly Anglo. This is an unjustifiable non sequitur. The site upon which the building was constructed could have handled a significantly larger facility which would have had long range effects on the overcrowded conditions of the area. Instead, for obscure reasons, the building was designed to hold only 450 pupils when the adjacent elementary schools in 1959 already had an excess pupil population of 617.

█ Although the use of Colorado Boulevard under other circumstances could prove to be a valid exercise of Board discretion, it cannot be justified under the facts here. The Board admits that other elementary school attendance areas are intersected by major traffic thoroughfares, and that in at least one instance an elevated crossing was built to facilitate pupil safety. Thus it was not an immutable boundary which absolutely precluded the extension of attendance lines. On the whole, when viewing the reason asserted by the Board for the construction of Barrett, in light of the actual results obtained, we cannot find clear error in the district court's finding that the size of the school and the location of its attendance boundaries reflected a purposeful intent to build and maintain a Negro school.

█ We are likewise compelled to support the findings of the trial court regarding the manipulation of boundaries and the use of mobile classroom units within the Park Hill area. These acts, found the trial court, "tended to isolate and concentrate Negro students in those schools which had become segregated in the wake of Negro population influx into Park Hill while maintaining for as long

3.

| School | Capacity '59 | Capacity '60 | Enrollment '59 | Enrollment '60 | % of Capacity '59 | % of Capacity '60 |
|--------|------|------|------|------|------|------|
| Columbine | 780 | 780 | 901 | 884 | 116 | 113 |
| Harrington | 450 | 450 | 690 | 546 | 153 | 121 |
| Park Hill | 660 | 630 | 859 | 650 | 130 | 103 |
| Stedman | 630 | 630 | 687 | 698 | 109 | 111 |
| Barrett | — | 450 | — | 507 | — | 113 |

as possible the Anglo status of those Park Hill schools which still remained predominantly white." 313 F.Supp. at 65.

The Board's refusal to alter the Stedman attendance area in 1962 was not an affirmative act which equates with de jure segregation. The evidence reflects that the proposals would have assigned Stedman students to Smith, Hallett and Park Hill Elementary Schools. Although the racial composition of each of these schools was predominantly Anglo in 1962, Park Hill was well over capacity, Hallett was slightly over capacity, and Smith was just under capacity. But more important, the residential areas which were to be part of the transfer contained less than 5% Negroes. Thus by making those alterations in attendance zones, Stedman would have lost Anglo pupils to the other schools. There can be no racial overtones attributed to the Board's refusal in 1962 to make the requested Stedman transfers.

However, we have found no evidence, nor have appellants referred us to data, which rebuts or justifies the 1962 Hallett to Philips transfer. Both schools were predominantly Anglo at the time, but Hallett was in a transition stage going from 85 to 95% Anglo in 1962 to 41.5% Anglo in 1964, and to 90% Negro in 1969. The students which were sent to Philips were in the former Hallett—Philips optional zone and were virtually 100% Anglo. The trial court held that the only thing accomplished by the rezoning was the moving of Anglo students from a school district which would gradually become predominantly Negro to one which has remained predominantly Anglo. The evidence does not contradict that analysis.

The other boundary alteration that gave rise to the trial court's finding of gerrymandering of attendance zones in the Park Hill area occurred in 1964. In 1963, Hallett was 68.5% Anglo, Philips was approximately 98% Anglo; Stedman was about 19% Anglo, and Park Hill was over 95% Anglo. The first change transferred a predominantly Anglo portion out of Stedman to Hallett. Second, the Park Hill—Stedman optional zone, which was virtually all Anglo, was transferred to Park Hill. Third, a predominantly Anglo section of the Hallett district was transferred to Philips. A predominantly Anglo section of Stedman's district was sent further east to Hallett. In 1964, Hallett was reduced to 41.5% Anglo, Philips was roughly 82% Anglo; Stedman was about 15% Anglo, Park Hill was about 90% Anglo.

Although there is a sharp conflict between the parties as to whose testimony and what data should be credited, there is evidence in the record to support the trial court's determination that these were segregative acts taken with knowledge of the effect they would have. The trend is clear that as the Negro population expanded into new neighborhoods, the predominantly Anglo clusters were transferred, by the Board, to one of the remaining predominantly Anglo schools. Smiley Junior High was deemed to be a segregated school because of the racial composition of its students and its faculty. In addition, it appears that Anglo students were permitted to transfer to predominantly Anglo schools even though they lived in the Smiley attendance area. The findings of the trial court, plus the additional effects of allowing Anglos to transfer out of Smiley, are supported by evidence of record and must be sustained.

At this point we pause to acknowledge that the problems facing the school board of any metropolitan city are varied and difficult. The complexities of managing a large school district such as Denver's in a manner which provides equal educational treatment for all students are manifestly made more difficult when, through circumstances often beyond their control, a single racial group settles in a particular neighborhood. Even so, the perplexities of the task cannot be used to justify abdication of constitutional responsibilities.

When a community experiences a steady and ascertainable expansion of Negro population resulting in a new and larger "Negro community", the school board must exercise extreme caution and diligence to prevent racial isolation in those schools. When new buildings are built, new classrooms added, attendance areas drawn, and teachers assigned, the board must guard against any acts which reflect anything less than absolutely neutral criteria for making the decisions. The facts as outlined above simply do not mirror the kind of impartiality imposed upon a board which adheres to a neighborhood school plan. *Cf.* Downs v. Board of Education of Kansas City, supra. In sum, there is ample evidence in the record to sustain the trial court's findings that race was made the basis for school districting with the purpose and effect of producing substantially segregated schools in the Park Hill area. This conduct clearly violates the Fourteenth Amendment and the rules we have heretofore laid down in the Downs and Dowell cases. *See* Taylor v. Board of Education of City School District of City of New Rochelle, 191 F.Supp. 181 (S.D.N.Y.1961); 195 F.Supp. 231 (S.D. N.Y.1961); aff'd 294 F.2d 36 (2nd Cir. 1961).

The second portion of appellants' first argument urges that the trial court erred in concluding that the act of rescinding Resolutions 1520, 1524 and 1531 was an act of de jure segregation in and of itself. It is their position that this was a valid exercise of the Board's legislative powers; that there was no segregative effect; and that there were no underlying segregative motivations.

Since we have sustained the findings regarding state imposed segregation in the Park Hill area schools, it is unnecessary to further decide whether the rescission of Resolutions 1520, 1524 and 1531 was also an act of de jure segregation. It is sufficient to say that the Board's adoption of those resolutions was responsive to its constitutional duty to desegregate the named schools and the trial court was within its powers in designating those Resolutions as the best solution to a difficult situation. Although the alternative plan proposed in Resolution 1533 is not totally devoid of merit, a realistic appraisal of voluntary transfer plans has shown that they simply do not fulfill the constitutional mandate of dismantling segregated schools. In fact, the voluntary transfer plans previously employed in Denver have had a minimal effect on the segregated status of the Park Hill area schools. In sum, we conclude that the trial court properly refused to accept Resolution 1533 as a workable solution. Once state imposed segregation is found, trial courts are to employ their broad equitable powers to insure full and immediate desegregation. *See* Brown v. Board of Education, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955). The implementation of Resolutions 1520, 1524 and 1531 comports with that duty and holds great promise in achieving that goal. (See Appendix I)

Appellants' second argument relates to the older core area of the city which is populated predominantly by Negroes and Hispanos. Appellees alleged in the trial court that the schools in this area were also segregated by unlawful state action. The trial court refused this plea, and it is the subject of the cross-appeal to be discussed below. However, in addition, appellees urged that a number of these same schools were offering their students an unequal educational opportunity, thus denying them their Fourteenth Amendment right to equal protection. The contention is premised on the assertion that when compared to the other schools in the district, the core area schools were offering inferior education.

The trial court preliminarily resolved that of the 27 schools allegedly offering a sub-standard education, only those with 70 to 75% concentration of either Negro or Hispano students would likely produce

cognizable inferiority. 313 F.Supp. at 77. The schools so designated were:

| School | Anglo (%) | Negro (%) | Hispano (%) |
|---|---|---|---|
| Bryant-Webster * | 23.3 | .5 | 75.5 |
| Columbine * | .6 | 97.2 | 2.2 |
| Elmwood * | 7.9 | 0.0 | 91.6 |
| Fairmont * | 19.8 | 0.0 | 79.9 |
| Fairview * | 7.0 | 8.2 | 83.2 |
| Greenlee * | 17.0 | 9.0 | 73.0 |
| Hallett * | 38.2 | 58.4 | 2.6 |
| Harrington * | 2.2 | 76.3 | 19.6 |
| Mitchell * | 2.2 | 70.9 | 26.7 |
| Smith * | 4.0 | 91.7 | 3.3 |
| Stedman * | 4.1 | 92.7 | 2.7 |
| Whittier * | 1.4 | 94.0 | 4.5 |
| Baker ** | 11.6 | 6.7 | 81.4 |
| Cole ** | 1.4 | 72.1 | 25.0 |
| Manual *** | 8.2 | 60.2 | 27.5 |

 \* Elementary \*\* Jr. High \*\*\* Sr. High

Ultimately the trial court did conclude that these designated schools were providing an education inferior to that being offered in the other Denver schools. 313 F.Supp. at 97–99. The relief decreed varied as to each level, but generally provided that the twelve designated elementary schools, including Elyria and Smedley, are to be integrated with an Anglo composition in excess of 50%. One-half of these schools were to be desegregated and integrated by the fall of 1971, and the remainder must be desegregated and integrated by fall of 1972. Baker Junior High is to be similarly desegregated and integrated by fall of 1971. As to Cole Junior High, it could either be desegregated and integrated as are the elementary schools by fall of 1972, or it could be made the center for essential district-wide programs. Manual High is to be operated as a district-wide school for the continuation and expansion of its vocational and pre-professional programs.

Specifically, the court found (1) that on the basis of 1968 Stanford Achievement Test results, the scholastic achievement in each of the designated schools was significantly lower than in the other schools in the district; (2) that during 1968 in the designated schools there were more teachers without prior experience, more teachers on probation (zero to three years of experience), and fewer teachers with ten or more years teaching experi-ence than in the selected Anglo schools; (3) that because of Board policy which allows intrasystem teacher transfers on the basis of seniority, the more experienced teachers transferred out of predominantly minority schools at the earliest opportunity; (4) that there are more pupil dropouts in the junior high and senior high schools in the designated schools; and (5) that the size and age of the school building do not of themselves affect the educational opportunity at a given school, but smaller and older buildings may aggravate an aura of inferiority.

The second portion of the finding that the designated schools offer an unequal educational opportunity is premised on the conclusion that "segregation, regardless of its cause, is a major factor in producing inferior schools and unequal educational opportunity." 313 F.Supp. at 82.

Preliminarily it is necessary to determine whether a school which is found to be constitutionally maintained as a neighborhood school might violate the Fourteenth Amendment by otherwise providing an unequal educational opportunity. The district court concluded that whereas the Constitution allows separate facilities for races when their existence is not state imposed, the Fourteenth Amendment will not tolerate inequality within those schools. Although the concept is developed through a series of analogized equal protection cases, e. g., Griffin v. Illinois, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956); Douglas v. California, 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811 (1963), it would appear that this is but a restatement of what Brown v. Board of Education, 347 U.S. 483, 493, 74 S.Ct. 686, 691, 98 L.Ed. 873 (1954) said years ago: "Such an opportunity [of education], where the state has undertaken to provide it, is a right which must be made available to all on equal terms."

For the moment we perceive no valid reason why the constitutional rights of school children would not be

violated by an education which is substandard when compared to other schools within that same district, provided the state has acted to cause the harm without substantial justification in terms of legitimate state interest. If we allow the consignment of minority races to separate schools, the minimum the Constitution will tolerate is that from their objectively measurable aspects, these schools must be conducted on a basis of real equality, at least until any inequalities are adequately justified. Hobson v. Hansen, 269 F.Supp. 401 (D.D.C.1967), *modified sub nom.* Smuck v. Hobson, 132 U.S.App.D.C. 372, 408 F. 2d 175 (1969).

 The trial court's opinion, 313 F.Supp. at 81, 82, 83, leaves little doubt that the finding of unequal educational opportunity in the designated schools pivots on the conclusion that segregated schools, whatever the cause, per se produce lower achievement and an inferior educational opportunity. The quality of teachers in any school is manifestly one of the factors which affects the quality of schooling being offered. And the evidence of the case supports the finding that the teacher experience in the designated core area schools is less than that which exists in other Denver schools. However, we cannot conclude from that one factor—as indeed neither could the trial court—that inferior schooling is being offered. Pupil dropout rates and low scholastic achievement are indicative of a flaw in the system, but as indicated by appellees' experts, even a completely integrated setting does not resolve these problems if the schooling is not directed to the specialized needs of children coming from low socio-economic and minority racial and ethnic backgrounds. Thus it is not the proffered objective indicia of inferiority which causes the sub-standard academic performance of these children, but a curriculum which is allegedly not tailored to their educational and social needs.

 As stated in the first instance then, the trial court's findings stand or fall on the power of federal courts to resolve educational difficulties arising from circumstances outside the ambit of state action. It was recognized that the law in this Circuit is that a neighborhood school policy is constitutionally acceptable, even though it results in racially concentrated schools, provided the plan is not used as a veil to further perpetuate racial discrimination. 313 F.Supp. at 71. In the course of explicating this rule and holding that the core area school policy was constitutionally maintained, the trial court rejected the notion that a neighborhood school system is unconstitutional if it produces segregation in fact. However, then, in the final analysis, the finding that an unequal educational opportunity exists in the designated core schools must rest squarely on the premise that Denver's neighborhood school policy is violative of the Fourteenth Amendment because it permits segregation in fact. This undermines our holdings in the Tulsa, Downs and Dowell cases and cannot be accepted under the existing law of this Circuit.

We cannot dispute the welter of evidence offered in the instant case and recited in the opinion of other cases that segregation in fact may create an inferior educational atmosphere. Appellees observe that several of the federal district courts across the land have indicated that because of the resulting deficiencies, the federal courts should play a role in correcting the system. Davis v. School District of City of Pontiac, 309 F.Supp. 734 (E.D.Mich.1970); United States v. School District 151 of Cook County, Illinois, 286 F.Supp. 786 (N.D.Ill.1968); Hobson v. Hansen, 269 F.Supp. 401 (D.D.C.1967); Blocker v. Board of Education of Manhasset, New York, 226 F.Supp. 208 (E.D.N.Y.1964); Branche v. Board of Education of the Town of Hempstead, 204 F.Supp. 150 (E.D.N.Y.1962); and Jackson v. Pasadena City School District, 59 Cal.2d 876, 31 Cal.Rptr. 606, 382 P.2d 878 (1963). However, the impact of such statements is diminished by indications in the Hobson, Blocker, Branche, Cook County,

Pontiac, and Jackson cases that the racial imbalance resulted from racially motivated conduct.

Our reluctance to embark on such a course stems not from a desire to ignore a very serious educational and social ill, but from the firm conviction that we are without power to do so. Downs v. Board of Education, 336 F.2d at 998. Before the power of the federal courts may be invoked in this kind of case, a constitutional deprivation must be shown. Brown v. Board of Education, 347 U.S. 483, 493–495, 74 S.Ct. 686, 98 L.Ed. 873 (1954) held that when a state segregates children in public schools solely on the basis of race, the Fourteenth Amendment rights of the segregated children are violated. We never construed Brown to prohibit racially imbalanced schools provided they are established and maintained on racially neutral criteria, and neither have other circuits considering the issue. Deal v. Cincinnati Board of Education, 369 F.2d 55 (6th Cir. 1966); 419 F.2d 1387 (1969); Springfield School Committee v. Barksdale, 348 F.2d 261 (1st Cir. 1965); Bell v. School City of Gary, Indiana, 324 F.2d 209 (7th Cir. 1963). Unable to locate a firm foundation upon which to build a constitutional deprivation, we are compelled to abstain from enforcing the trial judge's plan to desegregate and integrate the court designated core area schools.

Although the Board is no longer required by court order to correct the situation in the core area schools, we are reassured by the Board's passage of Resolution 1562 that the efforts made thus far will be only the beginning of a new effort to relieve the problems of those schools. In Resolution 1562, the Board has resolved that regardless of the final outcome of this litigation, it intends to improve the quality of education offered in the system. And it specifically directs the Superintendent and his staff to devise a comprehensive plan "directed toward raising the educational achievement levels at the schools specified by the District Court in its opinion." The salutary potential of such a program cannot be minimized, and the Board is to be commended for its initiative. Because of the significance of the Resolution, it is set out in full in Appendix II.

Appellants have also urged that mandatory bussing of students from the core area schools is neither compelled by the Constitution nor allowed by the Civil Rights Act, 42 U.S.C. § 2000c–6(a) (2). Although the disposition of the issue regarding the status of segregation in the core area schools obviates the necessity of deciding that issue, it is perfectly clear to us that where state imposed segregation exists, as it does in the Park Hill area, bussing is one of the tools at the trial court's disposal to alleviate the condition. It cannot be gainsaid that bussing is not the panacea of segregation. But, after considering all the alternatives, if the trial court determines that the benefits outweigh the detriments, it is within its power to require bussing. Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971).

The cross-appeal is first directed at the core schools which the district court refused to label as segregated by state action. At the outset, cross-appellants argue that they were required to labor under an erroneous burden of proof, and that the degree of justification for permitting racially imbalanced schools to exist was too low. The law of this Circuit guides us to approve the trial court's manner of handling the contested issues.

With the knowledge that we have said that neighborhood schools may be tolerated under the Constitution, it would be incongruous to require the Denver School Board to prove the non-existence of a secret, illicit, segregatory intent. It was indicated in the Tulsa case that neighborhood school plans are constitutionally suspect when attendance zones are superficially imposed upon racially defined neighborhoods, and when school construction preserves rather than eliminates the racial homogeny of given schools. United States v. Board of Edu-

cation of Tulsa County, 429 F.2d at 1258–1259. But that case dealt with a school system which had previously operated under a state law requiring segregation of races in public education. As in all disestablishment cases where a former dual system attempts to dismantle its segregated schools, the burden was on the Tulsa School Board to show that they had undertaken to accomplish a unitary public school system. Such an onerous burden does not fall on school boards who have not been proved to have acted with segregatory intent. Cross-appellants' reliance on United States v. School District 151 of Cook County, Illinois, 286 F.Supp. 786 (N.D.Ill.1968), aff'd 404 F.2d 1125 (7th Cir. 1968), is misplaced for the same reasons set out above. In that case, the court was likewise dealing with a school district which was segregated by unlawful state action.

■■■ Where, as here, the system is not a dual one, and where no type of state imposed segregation has previously been established, the burden is on plaintiff to prove by a preponderance of evidence that the racial imbalance exists and that it was caused by intentional state action. Once a prima facie case is made, the defendants have the burden of going forward with the evidence. Hobson v. Hansen, 269 F.Supp. at 429. They may attack the allegations of segregatory intent, causation and/or defend on the grounds of justification in terms of legitimate state interests. But the initial burden of proving unconstitutional segregation remains on plaintiffs. Once plaintiffs prove state imposed segregation, justification for such discrimination must be in terms of positive social interests which are protected or advanced. The trial court held that cross-appellants failed in their burden of proving (1) a racially discriminatory purpose and (2) a causal relationship between the acts complained of and the racial imbalance admittedly existing in those schools.

■■ The evidence in this case is voluminous, and we have attempted to carefully scrutinize it. Thorough review reflects that cross-appellants have intro-duced some evidence which tends to support their assertions. However, there is also evidence of record which supports the findings of the trial court, so under Rule 52 F.R.Civ.P. 28 U.S.C., we must affirm. It must be remembered that we do not review this record de novo but can reverse fact findings only upon *clear* error. That kind of mistake is not extant here. The background of the allegedly unlawful acts and the trial court's analysis of the Board's discriminatory intent and/or causation, with which we agree in each instance, follows.

The New Manual High School was constructed in 1953, just two blocks from old Manual High School. Through the years, from 1927 to 1950, Manual High had enrolled lessening numbers of Anglo students until in 1953, the school was less than 40% Anglo, about 35% Negro, and about 25% Hispano. The attendance zone for New Manual was the same as it had been for Manual, opening at about 66⅔% capacity. Cross-appellants contend that the construction of New Manual at its present location insured its segregated character, and that this act was equivalent to state imposed segregation. The trial court refused this argument on two grounds: First, that the decision to build New Manual on its present site was not racially motivated, and, second, that state action was not the cause of the current racial imbalance. 313 F.Supp. at 75.

In 1956 the Board adopted boundary changes which directly affected Manual High School (42% Negro) and Cole Junior High School (40% Negro). A portion of the Manual-East High optional attendance area was converted to a mandatory Manual attendance zone, and a portion of the Cole-Smiley Junior High optional attendance area was made a mandatory Cole attendance zone. The new mandatory zones were coterminous with the approximate eastern boundary of the Negro residential movement. Again the trial court held that cross-appellants had failed to establish that the boundary changes were racially motivated or that those alterations caused the

current racial imbalance. 313 F.Supp. 75.

In 1962 the Board adopted boundary changes which eliminated the optional attendance zones on three sides of Morey Junior High School. The changes involved transferring the Morey-Hill optional zone to Hill Junior High; the Morey-Byers optional zone to Byers Junior High; the Morey-Cole optional zone to Morey Junior High; and the Baker-Morey optional zone to Morey. Morey is located on the south side of the Cole attendance area and declined from 71% Anglo in 1961 to 45% Anglo in 1962. The trial court found, however, that despite the apparent segregatory effect at Morey, the concentration of Negroes at Cole was relieved, and the facilities at Hill, Byers and Baker Junior High Schools were better utilized. Thus, although on the surface the alterations appear to be racially inspired, there is evidence to sustain the trial court's finding that the changes were not carried out with the design and for the purpose of causing Morey to become a minority school. 313 F.Supp. at 72.

Cross-appellants have also alluded to other factors which they urge are probative of segregatory intent, i. e., faculty and staff assignments, obfuscation of minority achievement data, and double standards in dealing with overcrowding. Although minority teachers were usually located in the core area or Park Hill area schools, the Board's reason for doing so was not reflective of segregative desires. It operated on the prevailing educational theory of the day, that Negro pupils related more thoroughly with Negro teachers. The rationale was that the image of a successful, well educated Negro at the head of the class provided the best kind of motivation for Negro children and that in turn the Negro teacher had a greater understanding for the Negro pupil's educational and social problems. Although the validity of that theory is under severe attack today, we do not agree that the results of its past application infer segregatory intent. In response to new educational theories, the Denver public school system has today assigned Negro teachers to schools throughout the system and has reduced the percentages of Negro teachers in the predominantly minority schools.

We are unable to see how the evidence regarding the obfuscation of minority achievement data relates to the Board's alleged segregative intent. And although cross-appellants urge that a double standard was used to deal with overcrowded conditions, the trial court's reluctance to premise segregatory intent on that basis is supported by the record. The evidence reflects that the bussing of Anglo students was caused by the city's annexation of residential areas that did not have school buildings. Hence the school children in these annexed areas were transported to the nearest school where space was available. The premise of alleging a double standard in the treatment of races is resultingly non-existent.

The remainder of the issues designated in the cross-appeal have either been disposed of or made irrelevant by preceding parts of this opinion.

The Final Judgment and Decree of the trial court is affirmed in all respects except that part pertaining to the core area or court designated schools, and particularly the legal determination by the court that such schools were maintained in violation of the Fourteenth Amendment because of the unequal educational opportunity afforded, this issue having been presented by the Second Count of the Second Cause of Action contained in the complaint. In that respect only, the judgment is reversed. The case is accordingly remanded for the implementation of the plan in accordance with this opinion. The trial court is directed to retain jurisdiction of the case for the purpose of supervising the implementation of the plan, with full power to change, alter or amend the plan in the interest of justice and to carry out the objective of the litigation as reflected by this opinion.

See Appendix on next page.

## APPENDIX I

### RACIAL AND ETHNIC COMPOSITION OF SUBJECT SCHOOLS WITH RESPECT TO USE OF RESOLUTIONS 1520, 1524 AND 1531

If Resolution 1520 is used: [1]

| Senior High School | Total No. | Anglo No. | Anglo % | Negro No. | Negro % | Hispano No. | Hispano % |
|---|---|---|---|---|---|---|---|
| East | 2,600 | 1,776 | 68 | 649 | 25 | 175 | 7 |
| George Washington | 2,896 | 2,528 | 87 | 333 | 11 | 35 | 1 |
| South | 2,739 | 2,258 | 82 | 147 | 5 | 334 | 12 |
| Totals | 8,235 | 6,562 | 80 | 1,129 | 14 | 544 | 7 |

If Resolution 1520 is not used: [2]

| Senior High School | Total No. | Anglo No. | Anglo % | Negro No. | Negro % | Hispano No. | Hispano % |
|---|---|---|---|---|---|---|---|
| East | 2,623 | 1,409 | 54 | 1,039 | 40 | 175 | 7 |
| George Washington | 2,942 | 2,823 | 96 | 84 | 3 | 35 | 1 |
| South | 2,670 | 2,330 | 87 | 6 | 0 | 334 | 13 |
| Totals | 8,235 | 6,562 | 80 | 1,129 | 14 | 544 | 7 |

If Resolutions 1520 and 1524 are used: [3]

| Junior High School | Total No. | Anglo No. | Anglo % | Negro No. | Negro % | Hispano No. | Hispano % |
|---|---|---|---|---|---|---|---|
| Byers | 1,241 | 1,053 | 85 | 110 | 9 | 78 | 6 |
| Cole | 944 | 9 | 1 | 661 | 70 | 274 | 29 |
| Grant | 885 | 696 | 79 | 107 | 12 | 82 | 9 |
| Hill | 1,303 | 1,035 | 79 | 226 | 17 | 42 | 3 |
| Kepner | 1,483 | 1,016 | 69 | 70 | 5 | 397 | 27 |
| Kunsmiller | 1,949 | 1,544 | 79 | 245 | 13 | 160 | 8 |
| Merrill | 1,578 | 1,350 | 86 | 205 | 13 | 23 | 1 |
| Rishel | 1,286 | 939 | 73 | 39 | 3 | 308 | 24 |
| Smiley | 1,333 | 960 | 72 | 306 | 23 | 67 | 5 |
| Thomas Jefferson | 1,637 | 1,584 | 97 | 45 | 3 | 8 | 0 |
| Totals | 13,639 | 10,186 | 75 | 2,014 | 15 | 1,439 | 11 |

If Resolutions 1520 and 1524 are not used: [4]

| Junior High School | Total No. | Anglo No. | Anglo % | Negro No. | Negro % | Hispano No. | Hispano % |
|---|---|---|---|---|---|---|---|
| Byers | 1,138 | 1,053 | 93 | 7 | 1 | 78 | 7 |
| Cole | 1,219 | 46 | 4 | 884 | 73 | 289 | 24 |
| Grant | 815 | 696 | 85 | 37 | 5 | 82 | 10 |
| Hill | 1,753 | 1,685 | 96 | 26 | 1 | 42 | 2 |
| Kepner | 1,437 | 1,016 | 71 | 24 | 2 | 397 | 28 |
| Kunsmiller | 1,709 | 1,544 | 90 | 5 | 0 | 160 | 9 |
| Merrill | 1,578 | 1,550 | 98 | 5 | 0 | 23 | 1 |
| Rishel | 1,250 | 939 | 75 | 3 | 0 | 308 | 25 |
| Smiley | 1,553 | 367 | 24 | 1,112 | 72 | 74 | 5 |
| Thomas Jefferson | 1,597 | 1,584 | 99 | 5 | 0 | 8 | 1 |
| Totals | 14,049 | 10,480 | 75 | 2,108 | 15 | 1,461 | 10 |

1. Source: Compiled from *The Review*, Official Publication, Denver Public Schools, Vol. XLX (sic), May, 1969, supplemented by information supplied by school officials, *The Review*, Vol. XLIX, April, 1969. [Plaintiffs' Exhibit 7C]

2. Source: Compiled from *Estimated Ethnic Distribution of Pupils, Secondary Schools* —September 23, 1968, Denver Public Schools, Division of Personnel Services. [Plaintiffs' Exhibit 7D]

3-4. See notes 3-4 on page 1009.

## APPENDIX I

### RACIAL AND ETHNIC COMPOSITION OF SUBJECT SCHOOLS WITH RESPECT TO USE OF RESOLUTIONS 1520, 1524 and 1531

#### If Resolution 1531 is used: [5]

| Elementary School | Total No. | Anglo No. | Anglo % | Negro No. | Negro % | Hispano No. | Hispano % |
|---|---|---|---|---|---|---|---|
| Asbury | 570 | 480 | 84 | 61 | 11 | 29 | 5 |
| Ashley | 368 | 444 | 81 | 60 | 11 | 44 | 8 |
| Barrett | 368 | 269 | 73 | 88 | 24 | 11 | 3 |
| Carson | 720 | 562 | 78 | 144 | 20 | 14 | 2 |
| Denison | 580 | 482 | 83 | 31 | 5 | 67 | 12 |
| Force | 922 | 744 | 81 | 86 | 9 | 92 | 10 |
| Montclair & Annex | 753 | 602 | 80 | 120 | 16 | 30 | 4 |
| Moore | 622 | 460 | 74 | 90 | 14 | 72 | 12 |
| Palmer | 482 | 390 | 81 | 72 | 15 | 19 | 4 |
| Park Hill | 863 | 682 | 79 | 112 | 13 | 69 | 8 |
| Philips | 584 | 409 | 70 | 128 | 22 | 47 | 8 |
| Schenck | 765 | 638 | 83 | 31 | 4 | 96 | 13 |
| Steck | 431 | 353 | 82 | 73 | 17 | 4 | 1 |
| Stedman | 566 | 27 | 5 | 514 | 91 | 25 | 4 |
| Steele | 569 | 424 | 75 | 103 | 18 | 42 | 7 |
| Whiteman | 550 | 429 | 78 | 99 | 18 | 22 | 4 |
| Totals | 9,893 | 7,395 | 75 | 1,812 | 18 | 683 | 7 |

#### If Resolution 1531 is not used: [6]

| Elementary School | Total No. | Anglo No. | Anglo % | Negro No. | Negro % | Hispano No. | Hispano % |
|---|---|---|---|---|---|---|---|
| Asbury | 540 | 480 | 90 | 31 | 6 | 29 | 5 |
| Ashley | 550 | 472 | 86 | 35 | 6 | 43 | 8 |
| Barrett | 423 | 1 | 0 | 410 | 97 | 12 | 3 |
| Carson | 629 | 568 | 90 | 42 | 7 | 19 | 3 |
| Denison | 550 | 482 | 88 | 1 | 0 | 67 | 12 |
| Force | 862 | 744 | 86 | 26 | 3 | 92 | 11 |
| Montclair | 634 | 588 | 93 | 16 | 2 | 30 | 5 |
| Montclair Annex | 161 | 158 | 98 | 3 | 2 | 0 | 0 |
| Moore | 580 | 460 | 79 | 48 | 8 | 72 | 12 |
| Palmer | 482 | 442 | 92 | 24 | 5 | 16 | 3 |
| Park Hill | 963 | 684 | 71 | 223 | 23 | 56 | 6 |
| Philips | 555 | 307 | 55 | 203 | 37 | 45 | 8 |
| Schenck | 735 | 638 | 87 | 1 | 0 | 96 | 13 |
| Steck | 410 | 353 | 86 | 44 | 10 | 13 | 3 |
| Stedman | 686 | 27 | 4 | 634 | 92 | 25 | 4 |
| Steele | 499 | 424 | 85 | 33 | 7 | 42 | 8 |
| Whiteman | 610 | 537 | 88 | 49 | 8 | 24 | 4 |
| Totals | 9,869 | 7,365 | 75 | 1,823 | 18 | 681 | 7 |

3. Source: Compiled from *The Review*, Official Publication, Denver Public Schools, Vol. XLX (sic), May, 1969, supplemented by information supplied by school officials, *The Review*, Vol. XLIX, April, 1969. [Plaintiffs' Exhibit 8C]

4. Source: Compiled from *Estimated Ethnic Distribution of Pupils, Secondary Schools*—September 23, 1968, Denver Public Schools, Division of Personnel Services. [Plaintiffs' Exhibit 8D]

5. Source: Compiled from *The Review*, Official Publication, Denver Public Schools, Vol. XLX (sic), May, 1969, supplemented by information supplied by school officials. [Plaintiffs' Exhibit 9D]

6. Source: Compiled from *Estimated Ethnic Distribution of Pupils, Elementary Schools*—September 23, 1968, Denver Public Schools, Division of Personnel Services. [Plaintiffs' Exhibit 9E]

APPENDIX II

WHEREAS, this Board of Education, common with other boards of education in urban areas in this country, has before it the extremely difficult task of providing relevant and effective education to children of infinitely varied backgrounds and abilities; and

WHEREAS, this Board of Education is concerned about all the children of Denver and is constantly searching for ways and means to improve the quality of education offered to them; and

WHEREAS, this Board of Education has, as an interim measure, adopted various plans and approaches toward the improvement of the quality of education offered to the children of Denver, including voluntary open enrollment with transportation provided; and

WHEREAS, the intervention of a lawsuit in the United States District Court has prevented this interim measure from achieving its full potential; and

WHEREAS, that Court in its Memorandum Opinion dated March 21, 1970, has found that certain schools of this School District show average pupil achievement below the city-wide average achievement of pupils; and

WHEREAS, this Board is, and has been, aware of these differences in average pupil achievement among the various schools and has been attempting to set educational policy which will permit the professional staff of this School District to devise and employ new methods of education designed to improve achievement in all schools including those with low achievement averages, by such means as early childhood education, intensified reading programs, cultural arts centers, outdoor education centers, school clusters or complexes, in-service education, modification and expansion of curricular offerings, and other promising ideas; and

WHEREAS, the United States District Court now has invited this Board to devise and present to it a plan designed to improve the achievement of pupils in certain of its schools;

NOW, THEREFORE, IT IS RESOLVED by this Board of Education that, regardless of the final outcome of the litigation, this Board reaffirms its intent to continue improvement in the quality of education offered to all of the children of Denver, and it hereby directs the Superintendent and his staff to devise a plan directed toward raising the educational achievement levels at the schools specified by the District Court in its opinion. This plan shall be a pilot program which shall include consideration of the following:

1. Differentiated staffing;

2. Increasing the level of faculty experience and decreasing faculty turnover;

3. Increased and improved in-service training for staff;

4. Voluntary open enrollment as opposed to mandatory transfers for pupils;

5. The school complex concept which will focus on decentralized decision-making, community and parent involvement, new educational programs and agency cooperation;

6. Early childhood education;

7. Special programs now being implemented at Cole Junior High School and Manual High School;

8. Special programs available under the Educational Achievement Act of Colorado (Senate Bill 174);

9. Other promising educational innovations.

The plan shall be feasible and within the financial ability of the District, and include a timetable for implementation.

Such a plan shall be submitted to the Board on or before May 6, 1970.