**UNITED STATES of America, Plaintiff-Appellant,**

v.

**BOARD OF EDUCATION, INDEPENDENT SCHOOL DISTRICT NO. 1, TULSA COUNTY, OKLAHOMA, et al., Defendants-Appellees.**

No. 338–69.

United States Court of Appeals, Tenth Circuit.

July 28, 1970.

Rehearing Denied Sept. 8, 1970.

J. Harold Flannery, Jr., ·Washington, D. C. (Jerris Leonard, Asst. Atty. Gen., David L. Norman, Deputy Asst. Atty. Gen., Lawrence McSoud, U. S. Atty., John A. Bleveans, Charles Quaintance, and Bernard Shapiro, U. S. Dept. of Justice, Washington, D. C., were with him on the brief), for appellant.

C. H. Rosenstein, Tulsa, Okl. (David L. Fist, Tulsa, Okl., was with him on the brief), for appellees.

Before LEWIS, Chief Judge, and HILL and SETH, Circuit Judges.

LEWIS, Chief Judge.

By this appeal, the United States challenges the dismissal of its complaint by the United States District Court for the Northern District of Oklahoma. The suit was initiated pursuant to section 407 of the Civil Rights Act of 1964, 42 U.S.C. § 2000c–6[1] and the complaint alleged that the appellee School District had engaged in racial discrimination in its operation of the Tulsa schools, violative of the fourteenth amendment. The School District's formulation of attendance zones, administration of transfers, construction of new schools and assignment of faculty were cited as the specific elements of this discrimination. Accordingly, the appellant sought the imposition of a constitutionally acceptable level of integration of the white and Negro races within the Tulsa public schools. After trial, the district court denied that relief and dismissed the complaint, holding that none of the specific practices mentioned above was unconstitutional, either in conception or as administered. The overall policy upon which these practices were premised, the "neighborhood school attendance plan," was similarly upheld even though it tended to perpetuate a high degree of racial duality within the school system. The district court conceded that clear instances of what it termed "racial unbalance" were extant at the time suit was filed. The court held that such racial unbalance was constitutionally excused

---

1. This provision of the 1964 Civil Rights Act allows the Attorney General to institute an action on behalf of the parents of minor children who are unable to maintain such an action themselves and who are "being deprived by a school board of the equal protection of the laws."

in this case since it resulted from the impartial, good faith administration of a neighborhood school plan.

This decision and its supportive reasoning are inconsistent with current constitutional standards and gravely inapposite to the spirit of the cases in which these standards have been enunciated.[2] The judgment is therefore reversed and the cause remanded with orders to reinitiate proceedings consistent with the views expressed herein.

In order to approach the issues raised by this appeal, we must first outline the factual complex from which those issues evolved. The public school system operated by the appellees is comprised of 9 high schools, 21 junior high schools, and 75 elementary schools. During the 1968–69 school year, the total enrollment was 79,497; 87.6% of these students were white and 12.4% Negro. Of the 3,298 teachers within the school system, 88.1% were white and 11.9% Negro. As indicated above, the allocation of students and teachers among the schools was based on the "neighborhood school attendance plan." The hypothesis of this plan is that

> boundary lines for a school attendance district * * * are established to embrace as nearly as possible the area surrounding the school and taking into consideration such factors as the school capacity, number of students in the area, natural barriers to the movement of students from home to school and potential of an increase or decrease in student population in the future. (District Court Mem.Op., R. 735–36).

Implementation of this policy within the context of the generalized residential segregation which exists in Tulsa has effected a nearly equivalent level of segregation in the public schools. And none of the specific practices complained of by appellant has served to ameliorate this basic condition. The magnitude of racial separation that continues to exist in the Tulsa public school system is reflected in all of the component policies and practices detailed below.

### Attendance Zones

The Negro population of Tulsa is concentrated in a compact, well-defined area of north Tulsa. The enforcement of racially restrictive covenants by the Oklahoma courts prior to 1954 and continued discriminatory housing practices constitute a major cause of this concentrated racial isolation.[3] Washington High School, Carver Junior High School, Dunbar, Bunche and Johnson elementary schools were constructed within this area prior to 1955. During the 1955–56 school year, a common attendance zone was drawn around the junior and senior high schools which encompassed the attendance zones of all of the Negro elementary schools that had been established under the former system of explicit, legally mandated segregation. This zone included none of the attendance areas of the white schools established under the former system. The only Negro school not included in this all-black feeder system was South Haven Elementary located in southwest Tulsa which served a smaller but similarly constrained Negro population.[4]

Although some modifications have been made in the attendance zones that were superimposed on the north Tulsa Negro neighborhood, the schools within this area remain nearly all black. No white student attended any of the formerly separate Negro schools until 1966 when one white student was enrolled at Johnson Elementary School.

2. *See* Green and Holmes, *infra.*

3. The district court took judicial notice of the existence and past enforcement of racially restrictive covenants in the city of Tulsa.

4. The attendance zone for South Haven was drawn in 1955 to encompass the South Haven Negro neighborhood. The zone included none of the surrounding white areas. South Haven had an all-Negro student body until it was closed in 1967.

The fixing of attendance zones to correspond with racial residential patterns has rendered the "neighborhood school plan," as administered in these areas, highly inconsistent in many cases with the stated goals of that plan. For example, under the present policy of the School District, zones are to be shaped so as "to embrace as nearly as possible the area surrounding the school." (Dist.Ct.Mem.Op., *supra*, p. 7). Until 1960, Negro students who lived approximately one and a half miles from the all-white Monroe Junior High attended school at all-Negro Carver Junior High, approximately four miles distance from the same area. This situation terminated not because of the alteration of the attendance zones, but because of the construction of a new junior high school, Marian Anderson, within the Negro zone. No white student has ever attended Anderson Junior High. Until the 1967–68 school year, no white student attended Johnson Elementary.[5] White students living less than three blocks from Johnson were included in the all-white Osage Elementary attendance zone. Osage was seven blocks from the same area.

Another aim of the neighborhood plan is to avoid "natural barriers to the movement of students from home to school." (Mem.Op., *supra*). However, railroad tracks bisected the attendance zones of six of the Negro schools. Negro children residing in the Johnson Elementary zone were required to cross two sets of railroad tracks in traveling the one mile between this area of the attendance zone and the school. In 1967 a part of this area was incorporated in the Lowell Elementary zone. The Lowell School was only two blocks from this area. The Johnson zone is still transected by one set of railroad tracks.

## Construction of New Schools

Due to their location and constructed capacities, all of the schools built in Tulsa after 1955 opened with student bodies of one race.[6] Douglas Elementary, Woods Elementary and Anderson Junior High were constructed within the Washington High School attendance zone. The student bodies of these schools have been virtually all black since they were opened. Six new schools[7] were built in the area surrounding the Washington attendance zone and opened with nearly all-white student bodies. Five new elementary schools relatively distant from the Washington zone have been constructed since 1965 and each opened with an all-white student body and faculty. All of the schools built in the Washington attendance zone have been named in honor of prominent Negros. All of the schools surrounding this area have been named after whites.

As found by the court below, one of the stated goals implicit in the neighborhood school plan was to draw attendance zones so as to make optimum use of school capacities. McLain Senior High School was constructed north of Washington High School and opened in 1959 with a boundary line abutting the north and northwest edges of the Washington attendance zone. McLain was built with a capacity of 1,290 students and opened with an all-white student body of 610. At the same time, Washington High School was 20% over-enrolled. Rather than adjusting the McLain-Washington boundary to alleviate this over-enrollment, the School District constructed an addition to Washington which opened in 1959 with room for the excess students, all of them Negro. In 1959, Lindsey Elementary was constructed four blocks from the boundary of the all-Negro Bunche attendance zone. The student

---

5. At the time of trial, the Johnson student body was 48 white and 459 Negro.

6. The exceptions were Lindsey Elementary which had three Negro students when it opened in 1957 and Frost Elementary which had two white students when it opened in 1967.

7. Jackson Elementary, Lindsey Elementary, Whitman Elementary, Monroe Junior High, Gilcrease Junior High and McLain Senior High.

capacity of the Lindsey School was less than one-half that of the average newly constructed elementary school in Tulsa. At that time the Bunche facilities were being used by 1,318 Negro students, when its capacity was 660. Lindsey opened with three Negro students. Monroe Junior High, built a mile and a half from the northern edge of the Carver Junior High attendance zone, opened with an all-white student body of less than the capacity for which it was built (1,020 capacity, enrollment 959). During the same school year, 1,016 Negro students attended Carver which had a capacity of 840 students. To relieve the over-enrollment at Carver, Anderson Junior High was built in 1960—its attendance zone carved entirely out of the Carver zone and its opening student body all black.

### Transfers

Until 1965 the school board allowed "minority to majority" transfers whereby a student whose race constituted a minority in the school he would normally attend could transfer to a school where his race was in the majority. This policy was discontinued at the insistence of the Department of Health, Education & Welfare and supporting judicial mandate. Transfers are presently granted primarily on the basis of "child care" or "transportation." Even though the transfer program no longer explicitly incorporated racial criteria, as administered it has served as an efficient tool of segregation. During the 1968–69 school year, 2,965 "transportation" and "child care" transfers were granted; 89.4% of these transfers were into schools where 95% of the student enrollment was of the same race as the transferring student.

### Faculty Segregation

Until the 1965–66 school year, schools attended only by one race had a faculty composed entirely of the same race.[8] The racial composition of the faculties was changed as the racial composition of the student body changed. For example, the faculty and student body at Burroughs Elementary in 1959 was predominantly white. By 1962–63 the student body was all Negro and the faculty consisted of 15 white and 26 Negro teachers.[9] From the 1965–66 school year through the 1967–68 school year, 39 of the 59 predominantly white elementary schools had no Negro teachers, an additional ten had but one Negro teacher. Similarly, the 16 predominantly white junior high schools and eight of the nine predominantly white senior high schools had either no Negro faculty or a single Negro teacher.

The School District undertook, in the summer of 1968, a plan for faculty desegregation whereby the faculty of each school in the system would be 11% Negro and 89% white. During the 1968–69 school year, there were 37 predominantly white elementary schools with only one Negro teacher, 27 with two Negro teachers and one school with an all-white faculty.[10] When asked to explain the failure of the School District to execute the plan in these schools, the assistant superintendent for personnel testified that there were not enough Negro teachers to meet the quotas. "The only way we could get more would be to take them out of the Negro schools."

### The School District's Plan for Desegregation

At the time this proceeding was brought to trial, more than half of the public schools of Tulsa were attended

8. Washington High School and Douglas Elementary were "exceptions." They each had one white teacher.

9. A variation of the same practice is evidenced by the history of Frost Elementary, scheduled to open in 1966 with a 25% white enrollment. Consequently the school was assigned 10 black and 6 white teachers. However Frost had only one white student in its opening year. The following year 15 black teachers were assigned to Frost.

10. This was scarcely any improvement over the preceding year when one predominantly white elementary school had three Negro teachers, two had two Negro teachers and the remaining 42 white elementary schools had none.

entirely by students of one race, 51 were all white and five all Negro; 85% of the public schools [11] were at least 95% exclusively white or Negro. Nearly one-third of the Negro school children in Tulsa attend schools in which there are no white students. Fifty-seven percent of Tulsa's white children attend all-white schools.

The school board submitted a plan on December 8, 1968 to the court below to further desegregation in the Tulsa public schools. The plan provides for the "pairing" of Lindsey, a predominantly white elementary school, and Douglas, a Negro elementary. Changes in the attendance zones and grade structures of several other schools were implemented. Washington High School, previously all black, will have a projected Negro attendance of 80%. Six elementary schools will be operated with more than 75% Negro enrollment.[12] Five schools, Anderson Junior High, Carver Junior High, Bunche Elementary, Dunbar Elementary and Woods Elementary, will remain all Negro. Pursuant to the new plan, approximately 450 of the School District's 69,646 white students would attend previously all-black schools.

The School District has abandoned its original plan for faculty desegregation under which the racial composition of each school would correlate with the racial composition of the School District as a whole. The new objective is to have one-third of the faculty at predominantly Negro schools composed of white teachers. The available remaining Negro teachers would be "equitably distributed" throughout the school system.

\* \* \* \* \* \*

▮ In assessing the constitutional validity of the Tulsa neighborhood

school plan, the court below placed great if not plenary emphasis on its finding that the School District had administered the plan in good faith with no intent to foster or perpetuate racial discrimination in the Tulsa school system.[13] It was as a consequence of this finding that the district court held the Tulsa neighborhood plan and its attendant elements to be constitutionally valid. Indeed, we have stated that neighborhood school attendance policies, when impartially maintained and administered, do not constitute a genus of proscribed, unconstitutional discrimination even though the effect is to strike some degree of racial imbalance within the school system. Downs v. Board of Education of Kansas City, 10 Cir., 336 F.2d 988; and see Board of Education of Oklahoma City Pub. Sch. v. Dowell, 10 Cir., 375 F.2d 158, 166. However, the criteria by which the impartial administration of such a policy is measured go well beyond a mere assessment of the attitude and intent of those responsible for that policy. Before the "good faith" of the school administrators becomes constitutionally relevant, it must first be shown that the neighborhood plan has evolved from racially neutral demographic and geographical considerations. "Good faith is relevant only as a necessary ingredient of an acceptable desegregation plan." Henry v. Clarksdale Municipal Separate School Dist., 5 Cir., 409 F.2d 682, 684. In addition, those responsible for the school system must have adhered solely to those stated considerations in implementing and updating the neighborhood policy. *See* United States v. School District 151 of Cook County, Illinois, 7 Cir., 404 F.2d 1125, 1130.

---

11. 92 of 105.

12. Burroughs (99% Negro), Frost (99% Negro), Johnson (91% Negro), Hawthorne (90% Negro), Emerson (85% Negro), Whitman (78% Negro).

13. In its Memorandum Opinion, the district court stated, It \* \* \* is the finding and conclusion of the Court that the Defendants have acted in good faith

in the discharge of their duties under the Brown and subsequent desegregation cases and that the Court should decline to issue the various orders suggested by the Plaintiff in this litigation. To do so would \* \* \* deprive the Defendant \* \* \* of the right to operate its system in good faith under a permissible neighborhood school attendance policy.

■ In the case at bar the record reveals clearly that neither of these requisites was or is present in the Tulsa public school system. The attendance zones as originally formulated were superimposed upon racially defined neighborhoods and were, therefore, discriminatory from their very inception. As the court stated in Brewer v. School Board of City of Norfolk, Virginia, 4 Cir., 397 F.2d 37, at 41–42,

> If residential racial discrimination exists, it is immaterial that it results from private action. The school board cannot build its exclusionary attendance areas upon private racial discrimination. Assignment of pupils to neighborhood schools is a sound concept, but it cannot be approved if residence in a neighborhood is denied to Negro pupils solely on the ground of color (footnotes omitted).

The adjustments that have periodically been made in the Tulsa attendance zones have done little to alleviate this constituent defect. And adherence to this racial pattern has, as we have indicated above, created instances where the configuration of particular attendance zones substantially contradicts the stated criteria of the Tulsa neighborhood plan, namely the proximity of student to school, accessible transportation routes from home to school and optimal usage of the student capacity of all the schools within the system. Similarly, the pattern of new school construction has preserved, rather than disestablished, the racial homogeny of the Tulsa attendance zones.

■■ As conceived, and as historically and currently administered, the Tulsa neighborhood school policy has constituted a system of state-imposed and state-preserved segregation, a continuing legacy of subtle yet effective discrimination. The constitutional duty imposed upon school systems which have engaged in such practices is clear. School boards operating state-compelled dual systems are "clearly charged with the affirmative duty to take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch." Green v. County School Board of New Kent County, 391 U.S. 430, 437–438, 88 S.Ct. 1689, 1693, 20 L.Ed.2d 716. As applied within the context of those systems applying a constitutionally acceptable neighborhood policy, it is imperative that this affirmative duty not be lost within the inflexible confines of unresponsive geographical boundaries. Henry v. Clarksdale Municipal Separate School Dist., supra; Northcross v. Board of Education of City of Memphis, 6 Cir., 333 F.2d 661. Consequently the appellee School District bears the affirmative duty of redescribing the Tulsa attendance zones so as to reduce and where reasonably possible to eliminate the racial identity of that group of students designated to attend any particular school.

The pattern of new school construction must similarly be altered so as to affirmatively promote the creation of a unitary school system in Tulsa. This has not been held to be an incumbent obligation of a school board when racial imbalance rather than state-imposed segregation was the condition sought to be corrected. Deal v. Cincinnati Board of Education, 6 Cir., 369 F.2d 55. However, as the court stated in United States v. School District 151 of Cook County, Illinois, supra, "it does not follow from the absence of a duty to achieve racial balance that a Board may deliberately select [new school construction] sites to achieve racial segregation." 404 F.2d at 1133. In this case, every new school except one that has opened in Tulsa since 1955 has had a student body composed entirely of one race. Whatever may have been the intent of those who chose the sites and capacities of these schools, the effect is unavoidably clear. The continued use of less efficient remedies such as bussing and majority to minority transfers could be avoided in the future by the judicious placement of needed new schools at locations which maximize the inclusion of

students of both races within the normal attendance zones formed around those locations.

The transfer plan presently administered by the appellee School District has, as we have indicated, aggravated the degree of segregation in the Tulsa schools, even though the ostensible criteria upon which a transfer is granted, such as "child care" and "transportation," are unrelated to this constitutionally proscribed effect. The district court took the view that the aggregate result of the transfer plan as administered, was excused because the evidence did not support the conclusion that the defendants had implemented the transfer program with the intent and purpose of fostering segregation. Whatever constitutional objection that remained was cured, in the view of the district court, by the fact that "the Defendants have announced their intention to tighten up the administration of all transfers."

In Green v. County School Board, *supra*, the Supreme Court invalidated the "freedom of choice" transfer plan operated by the respondents. The plan was unacceptable within the context of the segregated, dual school system found to exist in that case. No presently utilized transfer system was held to be unconstitutional per se; any particular transfer plan is to be evaluated by its measured effect, the extent to which "it offers real promise of aiding a desegregation program to effectuate conversion * * * to a unitary, nonracial system. * * * " 391 U.S. at 440–441, 88 S.Ct. at 1695. As it presently stands the transfer system in Tulsa offers no promise, real or illusory, of aiding in the process of desegregation; it is an obstruction to the mandated conversion to a unitary system and consequently the appellee School District bears the affirmative duty of removing that obstruction and administering the transfer program in a manner consistent with the goal of complete elimination of segregation.

The necessity of establishing a unitary school system is no less imperative in the area of faculty allocation. In its assignment of faculty, a school district is burdened with none of the impediments otherwise present in implementing a desegregation plan. The limiting effect of attendance zones and difficulties of transportation are not present in this area to any substantial degree. Responding to this attendant lack of difficulty, the appellee School District in the instant case initiated a faculty desegregation plan whereby the racial composition of each school's faculty would correspond to the racial composition of the faculty as a whole. This plan was later abandoned in favor of more flexible guidelines: each predominantly Negro school to have a one-third white faculty and the remaining black teachers equitably distributed among the predominantly white schools.

In United States v. Montgomery County Board of Education, 395 U.S. 225, 89 S.Ct. 1670, 23 L.Ed.2d 263, the Supreme Court responded to a like problem arising in a different context. The district court had issued an order providing that the school board must move toward a goal under which " 'in each school the ratio of white to Negro faculty members is substantially the same as it is throughout the system.' " 395 U.S. at 232, 89 S.Ct. at 1674. The court then established fixed ratios that were to be met during given school years in order to satisfy the stated requirement. The court of appeals struck down the order, holding that such fixed mathematical ratios were not constitutionally compelled and that ultimately the stated ratio need be only "substantially" or "approximately" met. The Supreme Court reversed and reinstated the trial court's order, stating that

[the district court] plan "promises realistically to work, and promises realistically to work *now*." [quoting *Green, supra*] The modifications ordered by [that] Court of Appeals, while of course not intended to do so, would, we think, take from the order some of its capacity to expedite, by means of specific commands, the day

when a completely unified, unitary, nondiscriminatory school system becomes a reality instead of a hope. 395 U.S. at 235, 89 S.Ct. at 1675.

The original plan of the School District recognized that specific commands, phrased in terms of stated ratios, were necessary to alleviate faculty segregation and that, in fact, such ratios could be satisfied. Accordingly, no compelling reason exists to withdraw from that previously recognized constitutional obligation. The original plan of the appellee School District should, therefore, be reinstated.

The judgment of the district court is reversed and the cause remanded with orders that the appellee School District begin immediately to effect the disestablishment of the segregated school system in Tulsa, for, as the Supreme Court has repeated, the time for "all deliberate speed" has run out. Alexander v. Holmes County Board of Education, 396 U.S. 1218, 90 S.Ct. 14, 24 L.Ed.2d 41. It is the affirmative duty of the appellee School District to come forward with a realistic, presently effective plan for desegregation, *Green, supra,* and it is the continuing duty of the district court to retain jurisdiction over the case until it is clear that constitutional requirements have been achieved. Raney v. Board of Education, 391 U.S. 443, 449, 88 S.Ct. 1697, 20 L.Ed.2d 727.