The **NATIONAL ASSOCIATION FOR the ADVANCEMENT OF COLORED PEOPLE, JOHNSTOWN, PENNSYLVANIA BRANCH,** an unincorporated association, et al., Plaintiffs,

v.

The **GREATER JOHNSTOWN, PENNSYLVANIA SCHOOL DISTRICT,** et al., Defendants.

**Civ. A. No. 71–783.**

United States District Court, W. D. Pennsylvania.

July 11, 1973.

Wendell G. Freeland, Pittsburgh, Pa., James I. Meyerson, Asst. Gen. Counsel, New York City, National Assoc. for the Adv. of Colored People.

Marlin B. Stephens, Johnstown, Pa., for defendants.

## OPINION

WEBER, District Judge.

This is an action to redress the alleged deprivation of civil and constitutional rights of plaintiffs by compelling the reopening of an elementary school closed by defendants in their administration of the Greater Johnstown, Pennsylvania, School District.

The court has jurisdiction under 28 U.S.C. §§ 1331(a), 1343(3), (4) and 42 U.S.C. §§ 1981, 1983, and 1988.

A glance at the map of the Greater Johnstown School District reveals a con-

figuration like the ink-blot of the Rorschach test. Each person who views the ink-blot sees something different in the configuration. To this viewer the configuration resembles a moth or butterfly, with a tiny central body and widespread wings. The Prospect area, where the Washington Elementary School is located, is in the small central body of the figure and the outspread wings represent the east and west ends of the District, where all the other elementary schools of the District are located.

The outspread wings themselves have holes which represent independent political enclaves completely enclosed by the City of Johnstown, whose territory is not included in the Greater Johnstown School District.

This configuration is dictated partly by the geographical features of the terrain, in incursions of impassable hills that encroach to the city center and divide areas that would appear adjacent on a flat map projection. 43.5% of the land in the area is not suitable for development because of hills, river valley and areas for flood control, and limited possibilities for transportation routes. Also, to a considerable extent this configuration is created by the political boundaries of adjacent independent municipal corporations, which boundaries have been preserved in the alignment of school districts, creating deep salients and wholly surrounded enclaves in the Greater Johnstown School District. The economic and administrative reasons for the exclusion of these enclaves and salients are not apparent on this record although the Greater Johnstown School District is the result of a consolidation of districts in 1961.

The Prospect area is a central city area of concentrated black population. There were formerly two elementary schools in the Prospect area but in January 1971 Hudson elementary school was closed and its pupils who formerly walked to school are now bussed to a new large elementary school complex in the east end of Johnstown. At that time Hudson school had 80 white and 65 black students. There was no proposal of transferring the Hudson school students to nearby Washington school. Washington school was the only elementary school remaining in the Prospect area and it has a student population that is over 70% black. The ratio of black students in the entire school district is 8%.

The maximum student capacity of Washington school is 362 students and at the time of its closing it was under used. Its total student population has been declining.

For many years the Greater Johnstown School District had been attempting to follow a plan of long-range development by phasing out its older elementary school buildings and consolidating students in newer and larger buildings. A large step in that program was accomplished in February 1971 by the building of a new Meadowvale School in the east end of Johnstown and transferring more pupils into it while closing older, smaller schools in the east end. The closing of Hudson elementary school in the Prospect area was part of this program.

Because greater distances are involved this program requires increased transportation of pupils to Meadowvale School by bus.

The Pennsylvania Human Relations Commission is a state agency empowered to enforce measures to prevent racial discrimination. Pennsylvania Human Relations Comm. v. Chester School District, 427 Pa. 157, 233 A.2d 290 [1967].

In February 1968 the Pennsylvania Human Relations Commission issued desegregation instructions to 17 school districts in the state which included at least one school in which 80% or more of the pupils were non-white. On May 15, 1968 the Pennsylvania Human Relations Commission issued directions to eight school districts, including Greater Johnstown, in which at least one school contained 50% or more non-white pupils. On July 28, 1970 the Pennsylvania

Human Relations Commission sent a letter to the Greater Johnstown School District directing it to submit to the Pennsylvania Human Relations Commission by December 1, 1970 a plan for correcting the racial imbalance existing in the district's schools. The Board, on January 11, 1971, approved a plan which provided for the closing of Hudson School on February 1, 1971 (Plan I), and Washington School on September 1, 1971 (Plan II) [Exhibit 27]. After further negotiations with the Pennsylvania Human Relations Commission a plan covering the closing of Washington School and Tanneryville School on September 1, 1971 was approved by the Pennsylvania Human Relations Commission on June 30, 1971, and the Board proceeded to close down the Washington School facility during the summer of 1971. Late in the summer of 1971 the Pennsylvania Human Relations Commission requested a one year stay of carrying this plan into effect but, because of the prior physical closing of the school building, the Board considered it too late to stay the procedures already taken.

In furtherance of its consolidation program and in order to solve the problem of racial imbalance in the Washington School the Greater Johnstown School Board decided to close Washington School. Pupils from the Prospect area who attended Washington School were to be transported to various elementary schools in the west end of Johnstown. Another elementary school in the extreme west end of Johnstown with a 100% white pupil population was closed at the same time.

It is the plan of the Greater Johnstown School District to construct a large elementary school complex in the west end of Johnstown similar to the Meadowvale complex in the east end. This has not yet been done and the Prospect area elementary pupils are allocated among several existing elementary schools in the west end.

With Washington School closed at the beginning of the fall 1971 term, and its pupils being bussed to various west end schools, the end result is a more even racial balance through all of the elementary schools but this is achieved by having 80% of the black elementary school population being bussed as opposed to 40% of the white elementary school population.[1]

Plaintiffs argue that the burden of the schools' desegregation program is placed on the black students and that the decision to close Washington School was not made for educationally valid reasons but rather to relieve the white racial majority of the burden which the adoption of the alternate plans would entail.

ADDITIONAL FINDINGS OF FACT

1. Washington School was closed by Defendant Board of Education on June 22, 1971.

2. At the time of its closing the Washington School was the only elementary school in the Johnstown School District located in a heavy black concentrated population area.

3. At the time of its closing in 1971, Washington School was the only elementary school in the Johnstown School District that had a predominantly black enrollment.

4. All the former students of Washington School were transferred to elementary schools in the west end of Johnstown, to-wit, Beam, Chandler, Coopersdale, Oakhurst and Westwood Schools.

5. At the same time that Washington School was closed, the Board also closed Tanneryville School, an elementary school with 100% white population of 126 students. These students were transferred to Coopersdale and Chandler elementary schools in the west end of Johnstown.

6. That from 1961 to 1971 the Greater Johnstown School District has experi-

---

1. These percentages may give a distorted view of the problem. In absolute numbers 348 black students and 1,791 white students are bussed.

enced a declining school enrollment, despite the jointure of other school districts in the Greater Johnstown School District.

7. The pupil enrollment in the Greater Johnstown School District in 1971 was 8,990.

8. In 1957 and again in 1969 the University of Pittsburgh conducted surveys of the operations of the Johnstown School District in which recommendations were made for the closing of certain elementary schools.

9. In 1957 the Johnstown School District used 22 elementary school buildings that were considered in the University of Pittsburgh survey of these buildings.

10. Sixteen have been closed in accordance with the recommendation of the University of Pittsburgh.

11. Two new elementary school buildings have been added since the 1957 University of Pittsburgh survey.

12. There are no schools left in the Greater Johnstown School District that are commonly known as neighborhood schools.

13. The University of Pittsburgh survey of 1969 recommended the closing of the Washington School.

14. With 228 present students and a total capacity of 362 students, it is possible to bus into Washington School 134 additional students. Even if all the additional students were white the result would be 198 white and 164 black students. When compared with the 8% black student population of the District as a whole, such a concentration in a single school would violate the Recommended Elements of a School Desegregation Plan of the Pennsylvania Human Relations Commission of May 15, 1968.

15. There is no evidence that the Pennsylvania Human Relations Commission is requiring any further action by the Greater Johnstown School District to reduce segregation or achieve racial balance in the School District.

16. The racial concentration of black people in the Prospect area, and the number of black students living in the area of Washington School is subject to substantial reduction by reason of an Order of the Pennsylvania Human Relations Commission to the Johnstown Housing Authority of November 23, 1970 to reduce the number of black families in the Prospect Housing project from a total of 49 at the time of the hearing until a total of 15 were achieved by transfers of tenants to other available Housing Authority projects in the City of Johnstown. Such a change in population statistics would render any action of this court with regard to Washington School meaningless with respect to the problem of racial imbalance.

17. Washington School is situated in a narrow space along a hillside between two streets which present traffic hazards and congestion problems for school bus traffic. The school had no cafeteria or lunch program facilities. It had no playground facilities.

18. The schools to which the Washington School pupils were transferred have more adequate and safer facilities for the loading and unloading of school buses, cafeteria and lunch program facilities, and playground facilities.

19. In closing Washington School and transferring its pupils to other schools the School Board was exercising its judgment in consideration of a sound educational program, good administrative practice, safety of the students, and the efficient and economic use of its physical facilities.

20. The closing of the Washington School and the transfer of its students to other schools which they reached by bus, was not based on any motive or intent on the part of the School Board to impose any burden upon any group of pupils because of their race.

21. The closing of Washington School was motivated in part by a determination to eliminate the racial discrimination evidenced by the presence in the School District of a de facto segregated school, with a black pupil ratio of 72%

in Washington School compared to a 10% ratio in the entire district.

22. Other alternatives were available to the School Board in its program of school consolidation which would not require the closing of Washington School. However, these alternatives required extensive alterations to Washington School, considerations of safety and recreational facilities, and the bussing of students from other areas into Washington School as well as the bussing of some Washington School students elsewhere. The School Board considered these alternatives and rejected them for reasons consistent with its long term policy of administering a sound educational program for the benefit of all the schools of the district.

23. There is no evidence that the long term plans of the School District for school abandonment, closing and consolidation will serve or perpetuate a pattern of racial segregation. On the contrary, the closing of Washington School ends the most conspicuous example of de facto segregation in the School District.

24. There is no evidence that the time or distance of travel of any students required to be bussed is so great as to affect the health or the educational benefits of the students required to be bussed by the closing of Washington School.

## CONCLUSIONS OF LAW

1. The Greater Johnstown School District is charged under the School Code of the Commonwealth of Pennsylvania with the discretion of opening and closing school buildings in fulfilling its duty to operate the school system, and in doing so must consider the factors of a sound educational program for all students, the safety of all students, the health and recreation program of all students, and the economic effects of its policies upon the taxpayers of the School District.

2. The Greater Johnstown School Board did not arbitrarily draw boundary lines or arbitrarily impose bus transportation on any students or citizens based on racial distinctions in closing the Washington School.

3. The closing of Washington School was the result of an effort by the Greater Johnstown School District to end the de facto segregation that existed in the Washington School alone of all the schools in its district.

4. The closing of Washington School was done from sound educational motives for the advancement of the educational program of the entire School District, and in accordance with a long range program of improvement of its educational facilities, and in accordance with proper economic considerations for the impact of the program on the taxpayers of the district.

5. The closing of Washington School did not place an unconstitutional burden upon any racial or minority group.

6. The closing of Washington School was not done in violation of any rights of plaintiffs under the Fourteenth Amendment of the Constitution of the United States or of the Civil Rights Acts of 1866 and 1871 [42 U.S.C. §§ 1981, 1983 and 1988].

## DISCUSSION

The gravamen of plaintiffs' complaint to the extent that any relief can be afforded by this court, is that the impact of the School Board's planning in the consolidation of elementary schools has fallen on the black students by reason of the fact that the new elementary pupil assignments require a total of 2,139 elementary students to be driven to school by bus, of which 348 are black and 1,791 are white. There is a total of 473 black elementary students in the whole system and thus 83% of these must ride the school bus, while 1,971 out of 4,318 white elementary students, or 41%, are bussed. Thus, in respect to total student population of each race the burden now falls twice as heavily on the total black student population as on the total white.

All of this is urged in support of a plea to reopen Washington School. While the closing of Washington School added 164 black students and 64 white students to the bus line, the closing of Tanneryville School added 126 white students to the bus line. Thus, while the closing of this school increased the *percentage* of black students riding the bus line, the total number of white students *added* to the bus line was greater than the total number of blacks, and the total of all white students riding the bus is far greater than the total of all blacks.

It thus appears to the court that it is not by any action of the School Board that the percentage of blacks riding the bus is higher, but rather that prevailing housing or residential patterns compel this result whenever a policy of consolidation of students into fewer and larger school facilities is followed. Housing or residential patterns are transitory. The effective desegregation of the Prospect Housing Project would eliminate this problem in short order.

The bussing of students is a recognized tool for achieving school desegregation. Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 [1971], and it serves that purpose in this case by ending the obvious segregation of the Washington School. While the percentage of black students to be bussed is increased by this solution, this is the only logical result of the elimination of the overwhelming pattern of segregation evident in the Washington School. While the percentage of black students to be bussed compared to total black students is sharply increased, the percentage of black students bussed to total students bussed remains a substantial minority.

It is evident that no matter how far the School Board might go to accede to plaintiffs' proposal, the end result would only be a temporary, patched-up old school which still would have no playground facilities, and would present an even greater traffic hazard because of the increased bussing required. It would still require additional black students to be bussed out, thus adding to the percentage of black students riding the bus. It appears to the court that the School Board's rejection of this plan was based on sound premises of educational and financial administration.

■ As was stated in United States v. Board of Education, Independent School District No. 1, Tulsa County, Oklahoma, 459 F.2d 720 [10th Cir. 1972]:

". . . Neither is it possible to devise a plan that will please everyone . . . . Their validity should not depend on the whim or preferences of members of the federal judiciary. They must be judged by constitutional standards. If they accomplish the desired goal of creating a unified school system, and do so in non-discriminatory manner, we are constrained to approve them." (p. 724)

The closing of Washington School was not done solely because it was a predominantly black school. It was also a deteriorated and inadequate school building. The closing ended the de facto pattern of discrimination existing there and also advanced integration in the entire district. It did not set up a new form of discrimination in its place, Lee v. Macon County Board of Education, 448 F.2d 746, 753 [5th Cir. 1971]; Mims v. Duval County School Board, 447 F.2d 1330 [5th Cir. 1971].

We can find no unconstitutional pattern of racial discrimination in the decisions of the Greater Johnstown Board of Education to close the Washington School. The plaintiffs' complaint will be dismissed.