Billy Joe LINKER and Nancy L. Farha
et al., Plaintiffs,

v.

UNIFIED SCHOOL DISTRICT #259,
WICHITA, KANSAS, et al.,
Defendants.

Nos. W–4681 and W–4686.

United States District Court,
D. Kansas.

June 27, 1972.

Richard J. Rome, Hutchinson, Kan., Ted K. Sharp, Richard H. Rumsey, Wichita, Kan., for plaintiffs.

Donald R. Newkirk, of Fleeson, Gooing, Coulson & Kitch, Wichita, Kan., David L. Norman, Asst. Atty. Gen., Brian K. Landsberg and Joseph D. Rich, Attys., Dept. of Justice, Washington, D. C., Robert J. Roth, U. S. Atty., Wichita, Kan., for defendants.

## MEMORANDUM OF OPINION FINDINGS OF FACT AND CONCLUSIONS OF LAW

WESLEY E. BROWN, Chief Judge.

This is a civil action for injunctive relief in which the plaintiffs, as next friends of their respective minor children, seek to enjoin the defendant school district from operating under the terms of a desegregation agreement which was adopted by the members of the defendant Board of Education on May 17, 1971, and which was implemented upon the opening of the 1971–72 school year.

Both actions were originally and independently brought in the District Court for Sedgwick County, Kansas, and upon application of defendant school district were removed over opposition of the Farha plaintiffs, to this Court pursuant to 28 U.S.C. § 1443(2).[1] Thereafter, the Court ordered that defendant Richardson, in his capacity as Secretary of Health, Education and Welfare [HEW], be joined as an additional defendant. The cases were then consolidated, and following discovery and disposition of certain motions, the consolidated cases were pre-tried. Following the entry of the Pre-Trial Order, the Court ordered that the portion of the consolidated actions which purported to be a class action should be dismissed because it failed

to meet the prerequisites of Rule 23, Federal Rules of Civil Procedure. The parties agreed to submit the case on agreed facts and briefs. Briefs having been filed, the case is now ripe for disposition on its merits.[2]

The contentions of the plaintiffs in addition to questions of jurisdiction and the class action are summarized as follows:

The Farha plaintiffs contend that the defendants do not have

a) the authority and power under Federal and State Constitutions, the Kansas Statutes and the Kansas common law to perform certain acts agreed to, and outlined in the plan or agreement between defendant HEW and defendant school district, [hereinafter referred to as the "Plan"] which is now in full force and effect within the jurisdiction of defendant school district [hereinafter referred to as "District 259"];

b) contend in the alternative that the Plan violated the Sixth Article of the Bill of Rights of the Kansas Constitution of the Thirteenth Amendment to the United States Constitution in that as a result of the implementation of said Plan certain selected pupils were forced against their will to spend additional time each day on a school bus, which, in effect, constituted an act of penal servitude enforced by the defendants;

c) contend in the alternative that defendant Richardson acted in violation of HEW departmental rules and regulations in violation of his delegated statutory authority in his course of dealing with District 259 and the officers and members of the Board of Education thereof [hereinafter referred

---

1. A third action, Ellis Brown, et al. v. Unified School District No. 259, et. al., W–4680, was brought contemporaneously with W–4681 and W–4686, and was ordered consolidated with these latter cases. W–4680 was subsequently dismissed upon motion of the plaintiffs. Kenton H. and Kathleen G. Allen sought to intervene in W–4680, solely with respect to the propriety of a class action. Their motion to intervene was, in effect, denied when W–4680 was dismissed, and will not be considered in this action.

2. The *Linker* plaintiffs have not submitted a brief in accordance with Paragraph 10 (a) of the Pre-Trial Order.

to as the "Board"] in the formulation of the Plan;

d) contend in the alternative that the findings and conclusions of the Hearing Examiner which were made after the hearing in which District 259 was the respondent, and HEW was the complainant, should be judicially reviewed by this Court in accordance with P.L. 89–554 as incorporated within 5 U.S.C. § 551–9, for the purpose of determining whether the findings and conclusions of the Hearing Examiner should be overturned;

e) contend their attorneys are entitled to attorneys fees for their services.

The sole contention of plaintiff Linker is that the selection of the names of his children by the Board to participate in the Plan was accomplished in an arbitrary and capricious manner and thereby violated Linker's equal protection rights under the Fourteenth Amendment.

Each of these general contentions is divided into many component sub-contentions which we have considered and where necessary or appropriate, referred to in our legal conclusions.

### FINDINGS OF FACT

The parties have stipulated to the facts germain to this opinion. These stipulated facts, plus reasonable inferences arising from such facts, and found by the Court, are as follows:

As a matter of Kansas Constitutional [3] and Statutory law,[4] defendant District 259 is a body politic which includes Wichita and vicinity, and is governed by its Board of Education whose members are defendants herein. The Board receives all of its power and authority from the Kansas legislature and can act only through, or as the result of legislative grants.[5]

In addition to the authority granted to it by the Kansas legislature to govern District 259, the Board of the Unified School District is charged with certain duties imposed by other sections of the Kansas Statutes, applicable federal laws, and the Federal Constitution.

On July 13, 1965, District 259 submitted to the Department of Health, Education and Welfare a written assurance that it would comply with Title VI of the Civil Rights Act of 1964 and all regulations promulgated thereunder. [45 CFR Part 80.] Since that date District 259 has applied for and received federal financial assistance. On February 16, 1970, HEW informed the Board that on the basis of a review of the operation of District 259, it was not in compliance with the Act or its regulations. On February 18, 1970, HEW served upon the Board a Notice for Opportunity for Hearing to be held for the purpose of determining whether District 259 was in compliance with Section 601 and 602 of the Civil Rights Act of 1964 or regulations promulgated pursuant to the Act. This notice prayed that if District 259 should be found not to be in compliance with the law and regulations, an order be issued terminating federal financial assistance. The hearing was held on June 8–12, 1970, and on February 16, 1971, the HEW Hearing Examiner issued his Initial Decision finding that the defendant Board was operating a dual system of schools on the basis of race at the elementary level and that District 259 was in violation of Title VI of the Civil Rights Act of 1964 and regulations pursuant thereto. In April, 1971, representatives of the Board and HEW met to discuss steps that needed to be taken to bring the District 259 into compliance with the law. On May 17, 1971, the Board adopted the desegregation plan which is the subject of this suit.

HEW informed the Board that the subject plan and the assurances made in regard to its implementation would meet the requirements of the law, and that

---

3. Article 6 § 5, Kansas Constitution.

4. Chapter 72, Kansas Statutes Annotated.

5. Unless otherwise indicated, District 259 and the Board of Education will be considered as the same entity for purposes of this opinion.

deferral of federal funds could be lifted. Federal financial assistance to District 259 has never been terminated. From February 16, 1970, until August 18, 1971, District 259 was in a "deferred" status, i. e., they would continue to receive federal grants at pre-existing levels, but they were ineligible for new grants or increases in old grants.

In all proceedings above outlined, defendant Richardson and his predecessors in office were bound by the applicable provisions of the Rules and Regulations promulgated by HEW and incorporated in Title 45 CFR Part 80.

The desegregation plan adopted by the Board on May 17, 1971 and approved by HEW, applied only to the pupils attending elementary schools in District 259. The details of the Plan were developed after May 17, 1971, with the objective of establishing and maintaining racial integration in each elementary school. The standard used for the purpose of measuring racial integration of the elementary school was a ratio of black to white (we use this designation because the parties have done so) of not less than fifty per cent and not more than one-hundred and fifty per cent of black pupils on the basis of the total black elementary pupil population in the system.

The Board approved the Plan on June 21, 1971. The decision of the Board was partially induced by the urgings of federal officials under the supervision of defendant Richardson and by the fear of losing federal financial assistance to District 259. There is no evidence of any improper motive or arbitrary, unreasonable or capricious activity on the part of any member of the Board during the course of negotiations with HEW for federal funding and the adoption and implementation of the desegregation plan.

District 259 made no effort to obtain additional legislative authority for its actions at the time it adopted and implemented the Plan.

Three major aspects of the Plan are germain to the issues presented in this case. The first concerns the closing of certain elementary schools as classroom facilities and the demolition or diverting of these buildings to other uses. The second concerns the method by which students are selected for reassignment to schools other than their neighborhood schools. The third concerns the manner of its implementation, namely, "busing."

During the 1970–71 school year, there were 91 elementary schools in District 259. These schools were predominantly "neighborhood" schools, that is, their enrollment was determined primarily by a boundary system, and those students within the boundary attended their "neighborhood" school. Because there are some areas of Wichita whose racial composition is largely made up of Blacks, the enrollment of certain neighborhood schools was all, or practically all, of their children.

One facit of the Plan called for conversion of three of these neighborhood schools to integrated attendance centers. [Ingalls, L'Ouverture, and Mueller.] It was anticipated in the Plan that integration of these schools would be accomplished by assignment to these schools of 80–85% pupils of Whites. In addition, nine schools were eliminated as elementary attendance centers [Brookside, Eureka, Levy, Lowell, Willard, Dunbar, Fairmount, Isely and Little.] [6] The decision to close the latter four of these nine schools (which were all or predominantly all Black) formed a part of the discussions between the Board and HEW.

---

6. The decision to close the first five of these schools (which were all or predominantly all, white) was motivated primarily by economic, rather than desegregation purposes. Although this action was communicated to HEW by the Board, the closings did not form a focal point in the discussions concerning the Plan. [Document 4, letter from Beren-Pottinger dated June 17, 1971.] The Brookside and

Lowell School properties have been transferred to the Wichita Park Board for recreational purposes; the Eureka property is tentatively scheduled for use as a community center; the Willard building is to be used as a secondary attendance center for alienated youth. Special education programs are housed in the Levy Building. [Document 7, letter from Morris-Pottinger dated August 13, 1971.]

HEW did not object to the closing of Dunbar, Fairmount and Little Schools.[7] The decision to close Isely as an attendance center and to convert it to a community center was not agreed upon by the Board and HEW.

Lastly, the Board and HEW agreed that continuing measures would be taken to insure that the enrollment of those elementary schools whose boundaries are on the periphery of largely Black neighborhoods would not become majority-Negro schools.

The second major aspect of the Plan was the method by which racial balance would be achieved and maintained in District 259's remaining 82 elementary attendance centers. At the end of the 1970–71 school year, there were 33,730 elementary pupils in the District 259 system. The Plan incorporated a three-part method of integration: (1) pupils, both Black and White, who would volunteer to attend schools other than their neighborhood schools; (2) the retention or relocating of special education and other special programs in selected elementary schools, the resultant racial enrollment of which would be consistent with the Plan; and (3) a lottery selection system which would affect the involuntary assignment of certain white and black students to elementary attendance centers other than that of their neighborhood. The basic details of Part (3) of the Plan were as follows: All elementary pupils in District 259 were assigned a number from 1 to 366, corresponding to his or her birthdate. Thereafter, numbers were selected by computer on a random basis, and then retranslated into birthdates. The birthdates were arranged in order and students were selected to be reassigned on the basis of the position of their birthday on the master list. The students were then reassigned to schools which had been predetermined as having an unacceptable White-Black balance of pupils. These schools were located in what were referred to in the Plan as "Assigned Attendance Areas."[8]

---

7. Fairmount is scheduled to be demolished; the Dunbar building will be used for continuing education programs, and the Little building will be used as an early childhood center. [Document 7, letter from Morris-Pottinger dated August 13, 1971.]

8. The Revised Plan of June 21, 1971, sets out the mechanics of reassignment out of and into the "Assigned Attendance Areas:

"* * *

2. Sufficient numbers of black pupils *from* the Assigned Attendance Area will be reassigned from each of the three attendance areas to provide the desired ratio of black pupils in each school when compared with the building capacity. Likewise, ample numbers of white pupils *from* throughout the district will be reassigned to the three schools in the Assigned Attendance Area to reach the ratios as established in the memorandum of Agreement. Sufficient numbers of black and white pupils will be reassigned under the random method to complement the volunteer and discretionary methods and result in the desired ratios.

3. Sufficient numbers of black pupils will be reassigned *to* schools throughout the district, but outside the Assigned Attendance Area, to bring about integrated pupil populations of appropriate ratios in the various schools. Likewise, ample numbers of white pupils will be retained in these several schools to maintain the desired ratios.

4. Both the sending and receiving numbers of pupils will vary considerably among the eighty-two elementary schools and the numbers entering and exiting from any given school will not be the same. Among the factors affecting these numbers are:

a. The pupil capacity of the permanent school building.
b. The addition or removal of portable classrooms.
c. The existence or planned relocation of special programs.
d. The racial ratios of the projected pupil population from families residing in the attendance area adjacent to the school.
e. The number of volunteer enlistments.
f. The number of additional volunteers obtained from siblings of pupils selected under the random method.
g. The number of pupils deferred from reassignment.

5. Due to these elements, the number of pupils reassigned from a few schools

There were certain specifically-defined provisions in the Plan which, in effect, exempted a pupil from involuntary reassignment.[9]

In addition, a committee was established to hear and process applications of pupils who did not fall under the established exceptions, but who nevertheless did not wish to be reassigned outside their neighborhood.[10]

The third major aspect of the Plan concerns "busing". As a result of the

---

may be zero or near zero. In other schools the number will be quite large, e. g., in the three remaining schools in Assigned Attendance Area."

The record reflects that some 11 "attendance facilities" and their corresponding "attendance centers" were excluded from the Plan (i. e., pupils were not assigned and transferred to and from these schools) for the following reasons: [259's Answers to Interrogatories filed November 17, 1971.] [PTO ¶ 5(i).]

"Alcott Elementary School—small elementary school with 16.5 per cent Negro population and 2 per cent Mexican-American.

Arkansas Avenue Elementary School—integrated residentially, 26 per cent Negro pupil population, Follow Through Program.

Bridgeport Elementary School—integrated by 9 EMH all-Negro classes, 35.1 per cent Negro pupil population.

Buckner Elementary School—approximately 50 per cent Negro pupil population.

Carter Elementary School—32 per cent Negro pupil population.

Chisholm Trail Elementary School—deferred pending Board decision about Buckner. To be involved in assignment and transportation beginning second semester.

MacArthur Elementary School—integrated residentially, 16 per cent Negro pupil population.

North Pleasant Valley Elementary School—integrated as a result of the Follow Through Program, 30 per cent Negro pupil population.

Park Elementary School—small elementary school, integrated residentially, 32 per cent Negro pupil population.

Rogers Elementary School—integrated residentially, 15 per cent Negro pupil population.

Waco Elementary School—integrated residentially, approximately 15 per cent Negro pupil population and 30 per cent Mexican-American."

9. As stated in the Revised Plan of June 21, 1971, these exceptions are:

"a. All pupils whose racial identification as currently listed on the pupil master card is Oriental, American Indian, or Spanish-Mexican.

b. All black pupils who currently attend elementary schools which are residentially integrated and whose residence is in such an attendance area.

c. All pupils who are enrolled in special programs as defined in the discretionary method described above.

d. All Caucasian, Oriental, American Indian and Spanish-Mexican pupils who reside in the newly defined Ingalls, L'Ouverture and Mueller Elementary School attendance areas.

e. All pupils are enrolled in these areas of special education:

1) Trainable Mentally Handicapped
2) Orthopedically Handicapped
3) Visually Handicapped
4) Homebound and Hospitalized
5) Educable Mentally Handicapped—see Discretionary Method above
6) Learning Disabilities
7) Emotionally Disturbed
8) Hearing Impaired
9) Accelerated Learning Classes

f. White pupils who have volunteered to continue to attend L'Ouverture Elementary School.

g. Black pupils who are currently attending white schools under the majority-minority transfer policy where transportation is provided by the parents.

h. Pupils who have been or will be given one year special transfers to other than their neighborhood schools for reasons of child care or health.

i. Caucasian pupils currently enrolled in schools in residentially integrated attendance areas. Such pupils will be deferred only after close scrutiny relative to the racial composition of the school. Pupils in a currently integrated elementary school attendance area may be reassigned if 1) additional pupils are needed, or 2) if it can be demonstrated that the projected racial composition of the school deviates too far from the desired ratio.

Nothing in the plan may be construed to imply either widespread deferment on a group or individual basis. All the provisions in item number two above are designed to promote integration rather than to impede it."

10. Since the implementation of the Plan, a total of 195 elementary students were

implementation of the Plan, a total of 2,925 Black pupils and 1,318 White pupils were selected for reassignment. This represents a total of 12% of the total enrollment of District 259 who were selected from 67 of its 82 schools for reassignment.[11]

None of the reassigned pupils was required to ride a bus to his or her new school. However, bus transportation was made available at no cost to those students desiring it. Prior to the enactment of the Plan, a contract was in effect between the Board and a transportation company. This contract provided for the additional requirements placed upon the District by the Plan, and no bids for additional transportation were required.

There has been no judicial determination that the pupils and faculty of District 259 are or have been segregated in violation of the Fourteenth Amendment of the Constitution. The Board and HEW have entered into a stipulation that the HEW Reviewing Authority shall retain jurisdiction over the proceedings until December 31, 1972 and shall reopen them if:

a) The City of Wichita rescinds the Plan;

b) The City of Wichita fails to submit an adequate Plan for the 1972–73 school year;

c) The City of Wichita fails to operate Isely School as an integrated elementary school and the failure to so operate Isely is a discriminatory act.

The Board has reserved the right to seek judicial review in the event any of the above determinations are made.

excluded from assignment for the following reasons:

| | |
|---|---|
| Medical | 133 |
| Psychological | 3 |
| Race | 26 |
| Other Circumstances | 33 |
| | 195 |

11. In this connection, two of the plaintiffs of the Farha group have represented by affidavit that each has a child and that each child rides a bus to school. They

## CONCLUSIONS OF LAW

We are not involved in this case with the questions of enforcing a desegregation order of a Federal Court which had ordered the busing of children to accomplish that end.

We are involved with a school district which is seeking under the prodding of the Executive Branch of the Government instead of a court order to implement the Constitutional and legislative mandates enacted to protect all of the people of this nation regardless of race, creed, color, sex or national origin.

We are involved with equality of opportunity, and the efforts of the people of this nation through their Government, to afford to all the opportunity to develop and use their talents for their intelligent self interest and the national interest.

This Court not only has, but must take jurisdiction to carry out such Federal Constitutional and legislative mandates. It is obvious from even the most casual perusal of the facts in this case that the actions of the Board in formulating and operating the Plan were inextricably linked with HEW. The Board agreed with HEW in 1965 to operate its schools in accordance with the Civil Rights Act of 1964, and it adopted the Plan in whole or in part due to its desire to receive continued federal assistance administered in accordance with 42 U.S.C. § 2000d et seq., and 45 CRF Part 80. Given these facts, it is elementary that Secretary Richardson, as HEW's Secretary, is an essential party as contemplated by Rule 19 and 28 U.S.C. § 1391(e), and was properly joined as a party defendant.

represent that the total round-trip time spent by each of their respective children is 80 minutes per day.

The record reflects the following average times spent by assigned students who ride busses to school: [259's Answer to Interrogatories, Filed November 17, 1971.]

White Students: 43 min./day (one way)
Black Students: 31 min./day (one way)
Average of All
 Students: 37 min./day (one way)

This case was originally removed to this Court by the Board under the provisions of 28 U.S.C. § 1443(2) which provides:

"Any of the following civil actions . . . commenced in a State court may be removed by the defendant to the district court of the United States for the district and division embracing the place wherein it is pending:

(2) For any act under color of authority derived from any law providing for equal rights, or for refusing to do any act on the ground that it would be inconsistent with such law."

Both the Board and HEW contend that removal was proper under this section. We agree. See Bohlander v. Independent School District No. 1, Tulsa County, Okl., 420 F.2d 693 (10th Cir., 1969) and Burns v. Board of School Commissioners of City of Indianapolis, 302 F.Supp. 309 (S.D.Ind.1969), aff'd 437 F.2d 1143 (7th Cir., 1971) (per curiam).

An additional justification for this Court's jurisdiction, which was not present in *Bohlander*, is that HEW was made a party defendant to this action, and has actively participated in the case.

Little need be said concerning the Farha plaintiffs' contention that this case should be maintained as a class action. The requirements of Rule 23, Federal Rules of Civil Procedure, Hanna v. Plumer, 380 U.S. 460, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965) are applicable here.

There are two general requirements under Rule 23 for maintenance of class actions: that ". . . the persons constituting the class must be so numerous that it is impractical to bring them all before the Court, and the named representatives must be such as will fairly insure the adequate representation of them all." Wright, Federal Courts, 2d Edition, § 72.

In the consolidated cases before us the views held by the members of the Wichita community, which District 259 encompasses, concerning the issues in this case range from total acceptance of the Plan, to total rejection. In light of this divergence of opinion, the Farhas' claims cannot be "typical" of those of all the taxpayers and parents who reside in District 259, and therefore the action can not be properly maintained under Rule 23.

As a unified school district, District 259 ". . . possesses the usual powers of a corporation for public purposes . . ." and is authorized by statute to ". . . sue and be sued, execute contracts and hold such real and personal property as it may [acquire]," K.S.A. 72–8201. K.S.A. 75–4301 further defines a school district as a "quasi-municipal corporation." District 259 acts through the elected members of its Board.

It is a long-standing general rule in Kansas [12] that a private person, merely by virtue of being a citizen and taxpayer, may not maintain an action against a public board and its members unless he pleads and proves that he has or will suffer, as a result of the action complained of, damages different in kind from that of the public generally.[13] This rule has been applied where the claim is that the action of a school board violates the Kansas Constitution.[14] The Kansas Supreme Court has held that the proper party to assert an action to enjoin the trustees of a community high school from buying school busses was the state

---

12. First enunciated in Nixon v. School District, 32 Kan. 510, 4 P. 1017 (1884).

13. Capacity to maintain an action was found not to exist in the following cases: Haines v. Rural High School District, 171 Kan. 271, 232 P.2d 437 (1951); (action by taxpayer to enjoin expenditure of funds voted for one purpose and being used for another); Robertson v. Kansas City, 143 Kan. 726, 56 P.2d 1032 (1936) (action to enjoin issuance of general obligation bonds by city governing body) and Dunn v. Board of County Commissioners, 162 Kan. 449, 177 P.2d 207 (1947) (action to enjoin an election).

14. Asendorf v. School District, 175 Kan. 601, 266 P.2d 309 (1954).

through the county attorney,[15] rather than a private citizen.

A private citizen's right under Kansas law to seek injunctive relief from the actions of a public board is further limited by K.S.A. 60–907(b), which provides:

"Injunctive relief may be granted to enjoin any public officer, board, or body from entering into any contract or doing any act not authorized by law that may result in the creation of an additional levy of a tax, charge or assessment."

There is no substantial evidence to prove that the Plan will cause the plaintiffs any damages different from the public generally, but indeed shows that the Plan will result, as a practical matter, in a reduction in taxes.

■ Generally, to maintain an action brought by a private citizen against public boards or officers, he must show in addition to a statute which confers such capacity;[16] that he will suffer some type of damage different from that of the public generally;[17] and also that the non-judicial public board and officials acted in an illegal or oppressive manner.

The motive of the Board has not been challenged and we find no showing that the Board's actions in implementing the Plan were "illegal", "fraudulent", or "oppressive official conduct".[18]

■ The allegation that the Board exceeded its statutory authority by negotiating with HEW for continued receipt of federal education funds in return for District 259's agreement to operate its schools in accordance with the Plan [19] cannot be sustained either in fact or law.

The Kansas Constitution makes provision for the existence of both state [20] and local [21] boards of education. Kansas statutes provide that both state [22] and

---

15. Kansas v. Cruzan, 120 Kan. 316, 243 P. 329 (1926). The Farhas have not attempted to assert their claims through the Sedgwick County Attorney.

16. e. g., K.S.A. 60–907.

17. *Haines, supra.*

18. City of Kansas City v. Jones and Laughlin Steel Corp., et al., 187 Kan. 701, 360 P.2d 29 (1961) and Board of County Commissioners v. Brookover, et al., 198 Kan. 70, 422 P.2d 906 (1967).

19. District 259 requests that, in analyzing the Farha's contentions, we recognize as a matter of law and follow the presumption that the motives of the Board in all matters relating to the enactment of the Plan were lawful and proper, citing Soon Hing v. Crowley, 113 U.S. 703, 5 S.Ct. 730, 28 L.Ed. 1145. This request is unnecessary in light of our previous finding of fact that there is no evidence of improper motive on the part of any member of the Board.

20. Article 6. § 2. State board of education and state board of regents. (a) The legislature shall provide for a state board of education which shall have general supervision of public schools, educational institutions and all the educational interests of the state, except educational functions delegated by law to the state board of regents. The state board

of education shall perform such other duties as may be provided by law.

21. Article 6. § 5. Local public schools. Local public schools under the general supervision of the state board of education shall be maintained, developed and operated by locally elected boards. When authorized by law, such boards may make and carry out agreements for cooperative operations and administration of educational programs under the general supervision of the state board of education, but such agreements shall be subject to limitation, change or termination by the legislature.

22. K.S.A. 72–127. School facilities inventory; state board authorized to apply for and use federal grants. Pursuant to such policy and to public law 815, 81st Congress, 2d session, approved September 23, 1950, and acts amendatory thereof and supplemental thereto, the state board of education is designated the "state educational agency" responsible for carrying out the purposes of this act, and is authorized to make and file applications for federal funds as provided in said federal act or acts.

The state board of education is authorized and empowered to receive from the federal government, or any of its agencies, any funds made available under existing law, rules or regulations, or that may hereafter be made available for payment

local [23] boards of education may apply for federal grants. Both state [24] and local [25] school boards may expend federal funds ". . . in accordance with the law, and the rules, regulations and requirements under which such funds are made available . . ." The state board of education is specifically ". . . authorized and empowered to do all things necessary to comply with and carry out any such federal law or the rules and regulations promulgated thereunder by the federal government or any agency thereof . . ." [26]

■ The grant of legislative authority to local school boards to receive federal grants subject to federal laws and regulations carries with it the power to act in compliance with such laws and regulations. The Kansas Supreme Court has stated that school districts possess such powers as are conferred upon them by statute, specifically or by clear implication.[27] When the legislature has specifically authorized the state board of education to ". . . do all things necessary . . . to comply with . . . federal law" [28] We conclude that equivalent authority is also given by implication to local boards.

In addition to K.S.A. 72–8201, which provides that unified school districts shall possess the usual powers of a public corporation, K.S.A. 72–8212 [29] gives

of the expense of making an inventory and survey, and preparing and developing plans for school construction within the state; and the state board of education may expend the same for said purposes in accordance with the rules, regulations and requirements under which such funds are made available. [K.S.A. 72–127; L. 1969, ch. 310, § 11; July 1.]

K.S.A. 72–6202. Federal fund applications by state board of education; direct application by school districts. In the event the designation of a "state education agency" is required by federal laws now or hereafter enacted which make available federal funds for educational purposes, the state board of education is designated as the "state education agency" through which applications, reports, agreements and federal funds are to be channeled; and said "state education agency" is hereby authorized and empowered to do all things necessary to comply with and carry out any such federal law or the rules and regulations promulgated thereunder by the federal government or any agency thereof. Nothing contained in this section shall be construed as preventing any board of education or any educational agency of this state from making direct applications for or receiving directly federal funds made available for educational purposes in those cases where the federal law permits direct applications for and receipt of federal funds by any such board of education or its school district or educational agency of this state. [K.S.A. 72–6202; L.1965, ch. 410, § 44; L.1969, ch. 310, § 35; July 1.]

23. K.S.A. 72–6201. Federal fund applications by school districts and community junior colleges; use of federal funds.

The board of education of any school district or the board of trustees of any community junior college may make and file applications for federal funds appropriated and made available for school purposes by federal law. Any school district or any community junior college may receive from the federal government, or any of its agencies, any funds made available under existing law, rules or regulations, or that may hereafter be made available, for any and all school purposes. Any such board may expend the same for said purposes in accordance with the law, and the rules, regulations and requirements under which such funds are made available and such expenditures may be made even though the same were not included in the budget for the period in which such expenditures are made. [K.S.A. 72–6201; L.1965, ch. 410, § 42, L.1969, ch. 310, § 36; July 1.]

24. K.S.A. 72–127, *supra.*

25. K.S.A. 72–6201, *supra.*

26. K.S.A. 72–6202, *supra.*

27. Wichita Public Schools Employees Union v. Smith, 194 Kan. 2, 397 P.2d 357 (1964).

28. K.S.A. 72–6202, *supra.*

29. K.S.A. 72–8212. Thirty units of instruction requirement; general powers of boards; attendance subdistricts; sale of unneeded property; acquisition of property. Every unified district shall maintain, offer and teach grades one (1) through twelve (12), with kindergarten being optional, and shall offer and teach at least thirty (30) units of instruction in grades nine (9) through twelve (12) in each and every high school operated by the board. Such units of instruction, to

school boards of unified school districts the authority to sell unneeded school buildings and properties.

K.S.A. 72–8213 provides for the closing of schools and the changing of the use of schools.[30] K.S.A. 72–8213 distin-

qualify for the purpose of this act, shall have the prior approval of the state board of education. The board shall make all necessary rules and regulations for the government and conduct of such schools, consistent with the laws of the state. The board may divide the district into subdistricts for purposes of attendance by pupils. The board shall have the title to, and the care and keeping of all school buildings and other school property belonging to the district. The board may open any or all school buildings for community purposes, and may adopt rules and regulations governing such use of school buildings. School buildings and other school properties not needed by the district may be sold by the board, at a private or public sale, upon the affirmative recorded vote of at least a majority of the members of the board, at a regular meeting. If there is located on any school property sold at private sale a building the construction of which was completed less than twenty (20) years before the date of such sale, said property shall be sold for not less than three-fourths ($\frac{3}{4}$) of the appraised value thereof as fixed by three (3) disinterested electors of the unified district appointed to appraise said property by the county clerk of the home county of the unified district. Conveyances shall be executed by the president of the board and attested by the clerk.

The board shall have the power to acquire personal and real property by purchase, gift or by the exercise of the power of eminent domain, and if such acquisition is by eminent domain, such power shall be exercised in the manner prescribed in article 5, chapter 26, of the Kansas Statutes Annotated. [K.S.A. 72–6755; L.1965, ch. 410, § 16; L.1969, ch. 310, § 54; July 1.]

30. K.S.A. 72–8213 provides in pertinent part, as follows:

Closing schools; changing use of schools. (a) The board shall not close any attendance facility that was being operated at the time the unified district was organized if at least three-fourths ($\frac{3}{4}$) of the territory and at least three-fourths ($\frac{3}{4}$) of the taxable tangible valuation of the district which formerly owned such building is included in such unified district unless and until a majority of the resident electors within the attendance center of such attendance

facility shall give their consent thereto. Such consent may be given in writing in the form of a petition, or the board may submit the question to a vote of such resident electors in the attendance center at an election which shall be conducted in the same manner as for approval of bonds of the unified district. If a majority of those voting on the question vote in favor thereof, the same shall constitute consent for the purpose of this section. The board may close any attendance facility at any time except as is otherwise provided in this act. For the purpose of this section the following terms shall have the following meanings: The term "attendance facility" means a school building which has been property of a school district disorganized pursuant to this act, but which, at the time under consideration, is owned by the unified district. The term "attendance center" means the area around an attendance facility consisting of the territory in such unified district of the disorganized district which formerly owned such attendance facility.

Notwithstanding the other provisions of this act, the board of education of any unified school district may close any attendance facility which has failed to receive accreditation by the state superintendent of public instruction until that office is abolished or the state board of education thereafter, and in any such case no petition, election or other procedures shall be necessary as a condition to such closing.

(b) The board of any city unified school district which such city has a population in excess of 20,000 may close any of its attendance facilities at any time such board finds the same should be closed to improve the school system of such school district. The limitations of subsection (a) of this section shall not apply to any closing under this subsection (b).

\* \* \* \* \*

(e) Nothing in this section shall be deemed to restrict or limit the authority of any board to change the use of any attendance facility, so long as at least three (3) high-school grades, three (3) junior high-school grades, or six (6) elementary school grades are offered in such attendance facility. [K.S.A. 72–6756; L.1967, ch. 399, § 1; July 1.]

guishes and defines "attendance centers" [31] and "attendance facilities." [32]

We have found as a matter of fact that all the properties in question are "attendance centers." [33] A reading of the definitions discloses that an attendance "facility" is a school building whereas the attendance "center" is the geographic area surrounding the "facility". Pupils who live within the "center" attend the "facility". Obviously, one does not close an attendance "center"; only the "facility" is closed. As described in the Morris-Pottinger letter the attendance "centers" are discontinued and consolidated within other "centers" to achieve an optimum cost-benefit ratio.[34] Once this is done, the attendance "facility"—the school building and its associated property—may be disposed of according to statute. It may be closed in this case pursuant to 72–8213(b), *or* its use may be changed pursuant to 72–8213 (e). In the event that the facility is no longer needed, it may be sold or it may be opened for community purposes, both pursuant to 72–8212. The Kansas Legislature and the Kansas Supreme Court sustain the position that unified school districts and their governing boards of education shall be in

". . . control of city schools . . . The *discretion committed to that body is to be exercised . . . 'untrammeled by judicial interference.'* (Williams v. Parsons, 79 Kan. 202, 99 P. 216 [1916]). Its judgment, and not that of the courts, must determine the proper solution of the practical questions of administration that continually arise. Its decisions must be final, except when its action is capricious or arbitrary . . ." Williams v. Parsons, 81 Kan. 593, 106 P. 36 (1910).

The Board has the power and authority to agree with HEW to operate its schools in accordance with the Plan. The Board, in addition, has not abused its discretion with respect to the control of the properties in question, and its disposition of the nine attendance centers is within the provision of the Kansas statutes.

We turn now to the real reason for these lawsuits. It really makes no difference whether the Board had the authority under Kansas law to adopt and implement the Plan, or whether it had the authority to agree with HEW to operate its schools in accordance with the Plan. Nor does it matter whether the Board's primary motivation in adopting and implementing the Plan was to secure continued receipt of federal funds. The bare-bones fact is that the Board, along with all other public school governing bodies in the United States, has been for some eighteen years, and is now, required under federal law to operate its schools in such a manner that pupils and teachers will not be subject to discrimination because of race, color, national origin, creed or sex. This requirement is not an option which a school district may exercise depending upon whether state law says such a balance is required, or whether the district needs or wants federal funds. It is a requirement mandated by the Federal Constitution and implemented by federal law.

The United States Supreme Court, in reviewing and analyzing the progress which has been made toward the effectuation of the requirements enunciated by Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), stated in Green v. School Board of New Kent County, 391

---

31. "The term 'attendance center' means the area around an attendance facility consisting of the territory in such unified *school district of the disorganized district* which formerly owned such attendance facility."

32. "The term 'attendance facility' means a school building which has been property

of a school district disorganized pursuant to this act, but which, at the time under consideration, is owned by the unified district."

33. Finding of Fact 6; also Morris-Pottinger letter dated June 17, 1971, page 4.

34. *id*, page 2.

U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968) that:

"The burden on a school board today is to come forward with a plan that promises realistically to work, and promises realistically to work *now*. [Emphasis in original opinion].

This mandate has been reaffirmed in the recent case of Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971), reh. den. 403 U.S. 912, 91 S.Ct. 2200, 2201, 29 L.Ed.2d 689. *Swann* makes it equally clear that while it is within the power and discretion of an individual school board to develop a type of plan which effectuates the desired goal of a proper racial balance in its schools, that duty is affirmative and it is not dependent upon, or to be held in abeyance until, a federal court determines that a racial imbalance exists in the school system. In fact, *Swann* holds that a federal court has no authority to formulate and order implementation of an integration plan unless the board has defaulted on its duties [402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed. 567]. Accordingly, the fact that we have not determined that segregation did exist in any of District 259's elementary schools prior to the adoption and implementation of the Plan is immaterial to this lawsuit. Furthermore, if we do not have the authority to formulate a plan in the absence of a default by the Board, we need not dissect the Plan as adopted and minutely inspect its every aspect for the purpose of determining whether each and every provision thereof will have the desired effect of accomplishing constitutional prohibition against discrimination of persons because of race, color, national origin, creed or sex.

As we pointed out, *supra*, unlike so many cases involving similar subject matter, the Board is not being charged here with failing to take steps necessary to avoid discrimination within its schools, but instead, with taking steps that have, in effect, gone too far toward achieving that goal. Because there is no contention that the result of the Plan has not been to achieve a proper racial balance in District 259's elementary schools, we see no reason to evaluate the Plan's effectiveness in that regard. It is within this framework, then, that we move on to the remainder of the issues.

We have discussed the plaintiffs' contentions in terms of state law violations but it is obvious that each of these contentions is inextricably connected with rights granted under the United States Constitution.

It is a Constitutional contention that the Plan is defective because in formulating the Plan, the Board took into account the race of elementary pupils. We would point out, however, that the Supreme Court has recognized that in achieving racial balance in schools,

". . . steps will almost invariably require that students be assigned 'differently because of their race' (and that) (a)ny other approach would freeze the status quo that is the very target of all desegregation processes." McDaniel v. Barresi, 402 U.S. 39, 91 S.Ct. 1287, 28 L.Ed.2d 582 (1971).

We would also point out that in this Circuit

". . . that neighborhood school plans, when impartially maintained and administered, do not violate constitutional rights even though the result of such plans is racial imbalance. Keyes v. School District No. 1, Denver, Colo., 10 Cir., 445 F.2d 990, cert. granted, 404 U.S. 1036, 92 S.Ct. 707, 30 L.Ed.2d 728; United States v. Board of Education, Ind. School District No. 1, Tulsa, Okl., 10 Cir., 429 F.2d 1253; Board of Education of Oklahoma City Pub. Sch. v. Dowell, 10 Cir., 375 F.2d 158, cert. denied, 387 U.S. 931, 87 S.Ct. 2054, 18 L.Ed.2d 993. The mere existence of one-race schools, whether black or white, does not establish a constitutional violation. Neither black nor white children have a constitutional right to attend public schools with children of the other race. Downs v. Board of Education of Kansas City, 10 Cir., 336 F.2d 988, cert.

denied, 380 U.S. 914, 85 S.Ct. 898, 13 L.Ed.2d 800. A constitutional violation exists only when it can be shown that the existence of the one-race school and its attendance by children of that race is due to some form of discriminatory state action, however subtle that may be." United States and Smith, et al. v. Bd. of Educ. Independent Sch. Dist. No. 1, Tulsa, Okl., 459 F.2d 720 (CA10 1972).

■ Another Constitutional contention is that the Plan which pertains to the transportation of pupils violates the Thirteenth Amendment, in that, those students who ride busses to and from school are being subjected to "penal servitude". This novel contention is without merit. No student is required under the Plan to ride a bus to and from school. Such student is only given the opportunity to attend a particular school. Of course, many assigned students do ride busses, either out of necessity or convenience.

The Supreme Court dealt with the question of bus transportation in *Swann*, recognizing that it ". . . has been an integral part of the public education system for years . . ." [402 U.S. 29, 91 S.Ct. 282, 28 L.Ed.2d 574] and that in deciding whether bus transportation may be employed as a tool of school desegregation. "District courts must weigh the soundness of any transportation plan in light of . . ." the totality of the desegregation plan (402 U.S. p. 31, 91 S.Ct. p. 1283, p. 575). The Court cites several factors which may be considered:

"An objection to transportation of students may have validity when the time or distance of travel is so great as to risk either the health of the children or significantly impinge on the educational process . . . It hardly needs stating that the limits on time of travel will vary with many factors, but probably with none more than the age of the students."

The evidence shows that a maximum of twelve per cent of District 259's elementary students have been assigned away from their neighborhood schools; thus, no more than twelve per cent of the pupils stand to be affected by the Plan's transportation provisions.

■ There is no showing that the names of children for assignment have been selected in an arbitrary and capricious manner and thus in violation of the Fourteenth Amendment. The facts have shown that *all* elementary students in District 259 were subject to the lottery.

■ Considered in light of the Plan as a whole, and the evidence, we find nothing in the transportation provisions which would raise an issue of Constitutional import.[35]

The most expedient way to resolve the plaintiffs' contentions regarding the HEW administrative proceedings as set out in c) and d) *supra*, is through a determination of their standing to challenge these procedings.

In Taylor v. Cohen, 405 F.2d 277 (4th Circuit, 1968), it was held that parents of children have a limited right to make such a challenge. The Court said:

"Parents of children attending public schools are vitally interested in every public phase of the school system, including its finances and plan of assignment. Nevertheless, they do not have standing to seek judicial interference with a school board's exercise of its discretionary power. On the other hand, parents do have standing to enjoin a board's unconstitutional action, whether it originates in the school board itself or is the product of pressure brought by a government agency. Griffin v. School Board of Prince Edward County, 377 U.S. 218, 84 S.Ct. 1226, 12 L.Ed.2d 256 (1964). Here the constitutionality of the pro-

---

35. In this connection, the proposed Student Transportation Moratorium Act has no application to a case such as this wherein a pre-existing desegregation plan has been implemented on a voluntary basis by the school district, not by a Court Order.

posed change in the assignment plan is not challenged. The board's discretion to adopt the recommendation of HEW is undenied. The attack is mounted, instead, against the force that motivated the board—the threat of termination of federal funds. But this is in essence an indirect attack on the board's discretionary power, which the parents lack standing to pursue."

*Taylor* makes it clear that without regard to questions of standing, any judicial review of HEW action would be premature in that no final decision has been made by HEW to terminate funds to District 259. See also, United States v. Lovett, 416 F.2d 386 (8th Cir., 1969) (per curiam).

 We concur with *Taylor's* holding that the Farhas, as parents of local school children, lack the standing necessary to challenge these proceedings.

After the case was submitted to us the Farhas filed a motion to restrain District 259 from leasing the Isely School building for use as a community center. For the reasons heretofore stated, this motion is Denied.

In accordance with the foregoing, we determine that the Board possessed the authority to agree with HEW to operate its schools in accordance with the Plan and that under the facts before us it has not controverted the mandates of either Federal or State Constitutional or legislative enactments.

 The Farhas have requested that we award attorneys fees on their behalf to compensate their attorneys for the prosecution of this action. The general rule is that in the absence of a valid contractual provision a federal statute or a contrary requirement of applicable state law, a party is not entitled to recover attorneys fees. The Farhas request for the award of attorneys fees must therefore be Denied. See Speake v. Grantham, 317 F.Supp. 1253, 1285 (S.D.Miss., 1970), aff'd, 440 F.2d 1351 (5th Cir., 1971) (per curiam).

Finally, we have determined that it is appropriate and we will retain jurisdiction over this matter until December 31, 1972, the final date on which HEW must determine whether or not to terminate the funds to District 259. See United States v. Board of Education of Tulsa, Okl., 429 F.2d 1253 (10th Cir., 1970).

Prevailing parties will submit an order and judgment consistent with the foregoing findings of fact and conclusions of law.